FRANCISCO CRUZ, ETC., Plaintiff and Appellant, v. CENTRAL PASTO VIEJO, INC., Defendant and Appellee.

No. 5599. Argued May 6, 1932.—Decided January 11, 1933.

*Arturo Aponte* and *Fernando Gallardo Díaz* for appellant. W. L. *Newsome, Jr.,* and *J. Henri Brown* for apellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

In the amended complaint which forms the basis of this action the following facts are alleged:

That the plaintiff, Francisco Cruz, is a child nine years of age, and is represented in this action by his mother with *patria potestas,* Alejandrina Franco, a resident of Humacao; and that the defendant, Central Pasto Viejo, Inc., is a corporation organized under the laws of Puerto Rico, and with its principal office located in the judicial district of Humacao.

That on May 4, 1928, and prior thereto, the defendant was the owner of a sugar-cane plantation known as "Mulas," situated in the Municipality of Humacao, being likewise the owner of the plantations, oxen, carts, and farming implements used by it as part of its gainful business of planting and grinding sugar-cane and manufacturing cane-sugar.

That the plaintiff was born on June 30, 1918, and, on May 4, 1928, while he was working for the defendant on the said "Mulas" plantation, at the task of feeding *rabos* or cane-fodder to the oxen while said oxen were yoked to the carts used for transporting the cut cane, and at the task of gathering up the cane that fell from the carts during the trip, at a wage of fifty cents a day, and due to the negligence of the defendant, one of the said carts overturned, a part thereof falling on the person of the plaintiff, fracturing his skull and seriously injuring him, as a consequence of which he had to be confined in a hospital for several months, suffering intense physical pain and mental anguish, losing the natural sight of his eyes, being left partly paralyzed, and being rendered permanently disabled for any work.

That said minor was employed by said corporation without the certificate required by law being demanded of him, neither his mother nor his father being incapacitated or dependent on the plaintiff for support.

That the defendant has caused the plaintiff damages to the amount of $50,000 which is the amount claimed in this action as damages, with costs.

This complaint was answered by the defendant, Central Pasto Viejo, Inc., by admitting the first averment thereof, which relates to the capacity of the parties, and the second in so far as it refers to the fact that the defendant, on May 4, 1928, was the owner of the property known as the "Mulas" plantation and of the cane plantations, oxen, carts, and farming implements used by it as part of its gainful business of planting and grinding sugar-cane and manufacturing cane-

sugar; but the defendant alleged that on the day the supposed accident occurred, the minor, Francisco Cruz, was not working for the defendant corporation nor for any of its managers or employees, and that the accident occurred because the said minor's father, Raimundo Cruz, had ordered the plaintiff minor to go to another plantation owned by the defendant, ordering him to mount one of the carts that was going to the said place, and for such reason and as a consequence of the overturning of the cart, the plaintiff minor suffered various contusions on his person, for which he was treated in the Presbyterian Hospital in Humacao.

As new matter of defense and opposition to the amended complaint, the defendant set up that by a public deed, numbered 115, and dated June 2, 1928, executed in Humacao, P. R., Raimundo Cruz, father of the plaintiff minor, Francisco Cruz, and acting as father with *patria potestas* over his minor child, plaintiff herein, and Fernando Margarida, as vice-president of the defendant corporation, entered into a compromise agreement whereby Raimundo Cruz, as father with *patria potestas* over the plaintiff minor, released the defendant corporation from all liability, either direct or indirect, for the accident to his minor child, Francisco Cruz, and received by virtue of the said compromise agreement the sum of $450 as fair compensation for all damages that could be claimed from the defendant corporation by reason of the said accident; and in addition to the said sum, the defendant corporation likewise bound itself to pay all the expenses incident to the confinement of said plaintiff minor in the Presbyterian Hospital in Humacao, for all the time he might need to remain in the said hospital on account of the injuries received in the said accident, all which expenses, amounting to the sum of $40, were paid by the defendant corporation.

That the defendant corporation has had no intervention, either direct or indirect, in the accident to the plaintiff minor,

the proximate cause thereof being the negligence of the plaintiff's father, Raimundo Cruz, who ordered his minor child to mount one of the carts that were going to one of the plantations belonging to the defendant corporation.

A trial having been had and judgment having been rendered for the defendant, the plaintiff took the present appeal.

The lower court based its judgment on the agreement made by the defendant with Raimundo Cruz, in representation of his minor child, which agreement, according to that court, constitutes a compromise and has the character of *res judicata*. Below, we transcribe the said contract:

"NUMBER FIFTEEN.—COMPROMISE AGREEMENT.—In the city of Humacao, Island of Puerto Rico, on the second day of June, 1928,— BEFORE ME—JOAQUÍN VENDRELL JOUBERT, an attorney at law and notary public, with residence in the city of Caguas and a law office on Gautier Benítez Street of the said city, there appeared accompanied by the witnesses hereinafter mentioned,—Of the one part, RAIMUNDO CRUZ, of age, married, day laborer, and resident of this city, in representation of and as father with *patria potestas* over his minor child, FRANCISCO CRUZ;—and of the other part, FERNANDO MARGARIDA, of age, married, chemical engineer, and resident of Caguas, in his capacity of vice-president of Central Pasto Viejo, Inc., which is a corporation organized under the laws of the Island, with a principal office in the city of Caguas, registered in the office of the Executive Secretary of Puerto Rico, and authorized to do business in this Island. I, the notary, certify that the persons appearing are personally known to me, and likewise from their own statements, I certify to their age, status, profession, and residence.—They assert that they have the legal capacity necessary for executing this instrument, and not being aware of anything to the contrary, I believe they do have such capacity, and they freely DECLARE:

"*First.* Raimundo Cruz states that he has for some time been working for the Central Pasto Viejo, on piece-work in the weeding and cultivating of the cane plantations on the property known as 'Mulas,' owned by the corporation Central Pasto Viejo, Inc., and has been using his minor child, Francisco Cruz as water-boy (*aguador*) to distribute water to the laborers that the said Raimundo Cruz was using for the weeding.

"*Second.* That subsequently, and because this work had been finished, one of the overseers of the *Mulas* plantation, named Luis Rivera, ordered said Raimundo Cruz to go to work in the loading (*bombeo*) of cane in a cart on the plantation known as '*Mulas.*'

"*Third.* That in order that the party herein might use his minor child, Francisco Cruz, he ordered the latter to devote himself to feeding cane-leaves to the oxen.

"*Fourth.* That the child, Francisco Cruz, son of Raimundo Cruz, one of the parties herein, immediately mounted an ox-drawn cart that was going up the hill, and unluckily the cart overturned and the child's skull was fractured, and, in consequence of this accident, he had to be taken to the Presbyterian Hospital in Humacao, where he is now under medical treatment, the expenses for which are being kindly paid by the Central Pasto Viejo.

"*Fifth.* That in this accident none of the employees of the corporation Central Pasto Viejo, Inc., have intervened, either directly or indirectly, and that any work that was being done by the child of the party herein, Raimundo Cruz, was at the direction of said party herein, Raimundo Cruz, father of the minor Francisco Cruz.

"And the parties herein, Raimundo Cruz as father with *patria potestas* over his minor child, Francisco Cruz, and Fernando Margarida, as vice-president of the corporation Central Pasto Viejo, Inc., having agreed to enter into a compromise contract, do stipulate the following clauses for that purpose:

"A. That with a view of assisting the party herein, Raimundo Cruz, on account of the misfortune that befell his child, Francisco Cruz, at the time that the latter was obeying the orders of said party herein, Raimundo Cruz, the corporation Central Pasto Viejo, Inc., through its representative, the party herein, Fernando Margarida, has offered to the said Raimundo Cruz, the sum of FOUR HUNDRED AND FIFTY DOLLARS which the aforesaid, Raimundo Cruz, gladly accepts, and which amount he receives in this very act and in my presence, in a check for a like sum issued under number 1983, payable to the order of said Raimundo Cruz and drawn on the National City Bank of New York, Caguas Branch, for which he grants in favor of the corporation Central Pasto Viejo, Inc., the most effective release (*carta de pago*).

"B. That although the corporation Central Pasto Viejo, Inc., through its employees or any other person acting in its name, has been neither directly nor indirectly responsible for the accident to the minor child, Francisco Cruz; and for the purpose of avoiding

any litigation that might arise by reason of this accident, the amount herein above stated and delivered to Raimundo Cruz as father with *patria potestas* over his minor child, Francisco Cruz, shall be considered as a fair compensation for all the damages that might be claimed against the said corporation by reason of the said accident, and for that purpose the party herein, Raimundo Cruz, as father with *patria potestas* over his minor child, Francisco Cruz, binds himself not to institute any action against the corporation Central Pasto Viejo, Inc., by reason of said accident, it being understood that the amount herein received covers any damages that he -might claim on behalf of his minor child by reason of the said accident.

''C. The corporation Central Pasto Viejo, Inc., in addition to the amount herein paid as indemnity for damages, likewise binds itself to pay all expenses for medical attendance, medicines, and hospitalization in the Presbyterian Hospital in Humacao during all the time that the minor, Francisco Cruz, needs to remain in the said hospital on account of the said accident.

''D. The parties hereto, Raimundo Cruz and Fernando Margarida, state that the minor, Francisco Cruz, was not employed by, nor was he working for, the corporation Central Pasto Viejo, Inc., on the day the accident occurred.

''The parties accept this compromise as being in accordance with their agreement.

''And I, the notary, give the parties hereto the legal warnings pertinent to this act.

''They so state, and execute this instrument before me and before the witnesses present, who are of age, without legal impediment to act, and residents of this city, as they, Cruz Pérez and Marcos Ojeda, affirm.

''This instrument having been read to the parties and to the witnesses hereto, who renounced the right, of which I notified them, to read it for themselves, and it having been found correct, the parties hereto ratify it and all sign it before me; and to everything set forth herein I, the notary, certify. Raimundo Cruz.—F. Margarida.— Cruz Pérez.—Marcos Ojeda.—Signed and sealed, Joaquín Vendrell, Notary Public. There appear internal-revenue stamps to the value of one dollar canceled, and the notarial seal.

''It agrees well and faithfully with the contents of the original to which I refer. I certify thereto and, at the request of Central Pasto Viejo, Inc., I issue the present copy which I sign, seal and mark in Caguas, Puerto Rico, this the same day of the execution of the original. (Signed.)—Joaquín Vendrell, Notary.''

The foregoing document was signed by the parties on June 2, 1928. Prior to that date, namely, on May 24 of the same year, the defendant corporation appeared before the District Court of Humacao, and petitioned its approval of a compromise agreement entered into by the defendant with Raimundo Cruz, father of the minor, Francisco Cruz, by reason of the accident suffered by the latter on May 4, 1928. In this agreement the defendant corporation offered $450 to Raimundo Cruz, which he accepted as a fair compensation for all the damages that might be claimed against the said corporation by reason of the said accident. The district court held a hearing in regard to this application for judicial authorization, with the intervention of the district attorney and of attorney F. Gallardo Díaz, who appeared as intervener. The district attorney and Mr. Gallardo objected to the petition and the court took the matter under advisement. Meanwhile the parties, without waiting for the decision of the court, entered into the agreement which is set out as a new matter in the answer to the complaint.

The first question to be considered is whether Raimundo Cruz did or did not have power, in the absence of judicial authorization, to compromise the claims that his child could have had against the defendant corporation.

Compromise is a contract by which two or more persons avoid the provocation of a suit or terminate one which has already been instituted. Every compromise involves reciprocal concessions in order to avoid or terminate a litigation and to end definitely the uncertainty of the parties in regard to a question of right. "The capacity to compromise," says Manresa, "is conditioned upon the capacity to dispose of property, since" (according to said commentator), "the mutual concessions of the parties are equivalent to acts of alienation."

In regard to the capacity of the legal representatives of a minor to compromise with respect to his property and

rights, the Civil Code establishes certain differences between the powers granted to the guardian and those granted to the father. The guardian needs the express authorization of a district court in order to compromise and to submit to arbitration questions in which the minor might be interested, while the father, or the mother, as the case may be, may compromise with respect to the property and rights of the child who is under his or her *patria potestas,* save that the compromise will be ineffective without judicial authorization when the value of the thing involved exceeds $500. "The legal basis of said difference," says Manresa on page 107 of volume 12 of his Commentaries on the Spanish Civil Code, "rests on the greater confidence that the interest which parents at all times have in their children should have merited and should always merit from the legislator, and for that reason it empowers them to compromise with respect to their property and rights when the value of the thing involved in the compromise is so small that it does not exceed the amount fixed by law, though if it is over this amount, they will need judicial authorization, because without it the compromise can have no effect whatever."

In accordance with section 159 of the Civil Code, 1930 edition, the exercise of the *patria potestas* does not authorize either the father or the mother to alienate or encumber real property of any kind or personal property the value of which exceeds $500, belonging to the child and under their administration, without authorization from the court of the district where the property is situated, after proof of the need or utility of the alienation or the encumbrance. Under subdivision 5 of section 212 of the Civil Code, 1930 edition, it is necessary for the guardian to obtain the authorization of the competent district court to alienate or encumber the real property constituting the capital of the minors or incapacitated persons, or to make contracts or execute instruments subject to record, as well as to alienate personal property the

value of which exceeds $200. The doctrine that prevails in the United States grants wider powers to the guardian than to the father, as such, in regard to the rights and property of minors. For example, the father, as such, cannot, in the absence of a statute that so provides, compromise claims for or against his child. The guardian, in the absence of a restrictive provision, is authorized to compromise claims in favor of his ward, provided he acts in good faith. The statutes of some States, however, reserve to the courts the power to authorize compromises, and under these statutes the guardian cannot compromise without having obtained judicial authorization. In the State of Louisiana the authorization of the family council is necessary. The powers that are recognized as belonging to a guardian, in the absence of restrictive provisions, are based on the fact that he is really an arm of the court to the authority of which he is subject in the discharge of his functions. The guardian is a trustee who answers for the faithful performance of his duties and the administration of all the property that may belong to his ward and come under his authority or control. The father is the natural guardian of the person of the child and should be preferred over any other person in the appointment of a general guardian, the same as the mother in case the father is dead. This is the general rule of jurisprudence, unless there are powerful reasons for setting aside the parents, as when the welfare and happiness of the minor so require. When the father becomes the guardian, he has, naturally, the same powers as a general guardian in regard to the rights and property of his children.

In the State of Minnesota, where the law grants the father the right to institute an action for damages caused to his child, it has been held that the father is authorized to compromise, but the Supreme Court of said State has declared that this statute has been upheld against constitutional objections, because it treats the father as a statutory trustee.

*Hannula v. Duluth & I. R. R. Co.,* 130 Minn. 3, 153 N.W. 250. And in the case of *Picciano v. Duluth, etc. R. Co.,* 102 Minn. 21, 112 N.W. 885, decided by the same court, it was declared that a trusteeship having been created by the statute, the court retains jurisdiction of the matter and of the trustee, and his dealings with the ward may be reviewed at any time, when required for the protection of the ward.

The Court of Minnesota, taking into account the relation created by law, did not, by reason of the amount, impose limitations on the father for effecting a compromise in a case comprised in the statute. Our Civil Code establishes the general rule that the compromise will have no effect when the value of the thing involved in the compromise exceeds $500. The authority granted to the father, or to the mother, as the case may be, to compromise without the need of judicial authorization when the value of the thing involved in the compromise does not exceed $500, constitutes an exception to the general rule based on the smallness of the amount.

Now, then, does this power that is granted to the father to compromise, without judicial authorization, when the value of the subject matter does not exceed $500, authorize him to fix the amount and proceed without a judicial authorization when a cause of action for damages caused to the child arises? The Spanish Civil Code, by its section 274, authorizes the family council to obtain the opinion of one or more lawyers when it is a matter of a compromise for the approval of which, the guardian requests authority. The Spanish legislation, realizing the significance of a compromise, recognizes the advisability of the intervention of lawyers when the importance of the matter so counsels. In the instant case, a claim for damages for injuries received by a minor is involved, and it is generally known that in cases of this nature, the courts of justice themselves need arduous study in order to render a conscientious judgment in fixing the amount of the damages caused. It is true that a right of action for

personal injuries caused is generally of a doubtful and uncertain character, and the value of the subject matter may be affected by the uncertainty and the doubts that may be felt in regard to the final decision in a judicial action; but as there are various elements to be considered in order to judge the importance of the case, such, for example, as the injuries inflicted, the damages caused, the negligence, etc., all must be examined as a whole in order to appraise, even approximately, the value of the subject matter of the claim. Doubt and other circumstances may influence the amount fixed for the compromise; since this contract supposes mutual concessions, the value of the subject matter may exceed $500 and. the compromise be made for a smaller sum; but the law does not empower the father to dispense with the judicial authorization by taking as a basis the amount that he may wisely or capriciously fix for the compromise, but the value of the thing involved in said compromise.

A district court may, for example, authorize a compromise for an amount below $500, although the value of the subject matter may exceed that sum, by taking into account the uncertainty of the right, the inconveniences of a litigation, the mutual concessions inherent in every compromise, and other circumstances worthy of consideration; but this does not mean that the father was empowered to compromise and dispense with a judicial authorization in this case on account of the fact that a sum of less than $500 was fixed for the compromise. We are of the opinion that in a case like the present one in which the value of the subject matter depends upon the nature of the case, and in which it is not an easy undertaking to determine that value, the proper district court, and not the father, is the authority called upon to intervene in the last instance to approve or disapprove the compromise initiated by the father, as the interests of the minor may counsel. It is natural that in an action for damages, doubts should arise as to the value of the subject matter or cause of action, and when these doubts exist, we

should, in the interests of the minor, in the furtherance of justice, and in accordance with the spirit of the law, instead of applying the exception, be governed by the general rule that requires judicial authorization before a compromise can have any effect.

In the instant case, the defendant delivered $450 to Raimundo Cruz, and it was set forth by the parties that this sum should be understood to be a fair compensation for all damages that might be claimed against the said corporation by reason of the accident, Raimundo Cruz, in representation of his child, binding himself not to institute any action against the defendant corporation, believing that the amount received covered any damages that he, in representation of his minor child, might be entitled to recover by reason of the said accident.

And immediately following, the defendant corporation declares that in addition to the amount herein paid as indemnity, it binds itself likewise to pay all expenses arising from medical attendance and medicines, as well as those incident to confinement in the Presbyterian Hospital in Humacao, during all the time that the minor, Francisco Cruz, may need to remain in the said hospital.

The document introduced in evidence clearly shows, that the agreement was not made exclusively for the amount of $450, but the expenses for hospitalization, medical attendance, and medicines which the defendant bound itself to pay were also taken into account. The accident occurred on May 4, 1928, and on June 2, of the same year, when the agreement was formalized, the minor had been twenty-nine days in the hospital, as is shown by the agreement itself. So that if we rely exclusively on the agreement made by the parties, it is apparent on the face of it that besides the $450 delivered to Francisco Cruz, the defendant bound itself to pay an indefinite amount for the expenses incurred and those which might be incurred during the whole time the minor needed

to remain in the hospital. Let it be added to this that the compromise contract implies mutual concessions, and as it is reasonable to suppose some concession on the part of Francisco Cruz in regard to the amount, it is logically deduced from the contract itself that the parties had *in mind,* in appraising the value of the subject matter, a sum greater than $500.

If we rely on the evidence, we will see that the defendant, in the averment that it sets up as new matter, fixes at $40 the amount paid for expenses, but it offers no evidence whatever to sustain this allegation, which, in accordance with the Code of Civil Procedure, should be considered as denied. The only witness who testifies in regard to the expenses, Agustín Martínez de Andino, manager of the defendant corporation, says that the hospital bill, including all the X-ray photographs taken of the child and the cost of medicines from the pharmacy, was paid, but he does not fix the sum paid or the amount of those expenses. At the time the agreement was made, the contracting parties did not know what would be the amount of these expenses since the minor was still in the hospital and the defendant bound itself to cover said expenses during all the time said minor needed to remain there, and Dr. Segarra, the defendant's physician when the accident occurred, and who attended the child after first aid had been given by Dr. Skent, says that Francisco Cruz was in the hospital two or three months. The lower court made a similar statement in its findings of fact.

In our opinion, it clearly appears, on the face of the agreement itself, that the compromise contract did not acquire legal existence, since the requirement of judicial authorization was not complied with.

The learned attorneys for the defendant cite in its favor the judgment of the Supreme Court of Spain, of June 8, 1917, in which that court declared that a compromise agreement is perfected by the consent of the parents, although for

its consummation, that is, for its becoming effective, it needs. judicial authorization. It that case, a compromise contract was made with the mother of some minors, whom she represented. After some time had passed, the other party requested the rescission of the contract, and the Supreme Court of Spain held that the mother having opposed in the suit the claim of nullity of the compromise, instead of submitting it for judicial approval within the time that intervened up to the filing of the claim, it was evident that she had failed to fulfill a reciprocal and conditional obligation thus giving cause for the rescission of the contract, according to section 1124 of the Spanish Civil Code (1077 of our Civil Code, 1930 edition). It is well to bear in mind that, according to section 1290 of the Spanish Civil Code, equivalent to section 1242 of our Civil Code, 1930 edition, contracts validly entered into may be rescinded in the cases established by law.

In said judgment, the Spanish court holds that a contract of alienation executed without judicial authorization is null and void for lack of capacity of the parents, but not so a compromise contract which is perfected through their consent.

We cannot agree with this conclusion of the Supreme Court of Spain, however much its decisions merit our most profound respect. Perfection is determined by the complete, perfect, definite agreement of the parties as to the relations created and the obligations established. Once the contract is perfected, the parties are bound to make it effective by its consummation. If, as the Supreme Court of Spain holds, a contract becomes perfected by the consent of the parents, although for its consummation, that is, for its becoming effective, it needs judicial authorization this would be the only case in which perfection would not be effective without consummation. Consummation is a necessary consequence of perfection. After a contract is perfected, the parties are bound to the consummation thereof. A court of justice is not similarly bound by reason of the fact that the father of a

minor may have agreed upon a compromise. We cannot understand how one of the contracting parties could compel a court of justice to impart its approval to a contract with which it is not in accord, in order to fulfill the requirement of consummation. If we accept the opinion of the Supreme Court of Spain, we would find ourselves in the presence of a perfected contract, the consummation of which cannot be demanded, as it does not depend on the will of the parties but on the will of a competent court which, in the exercise of its discretionary powers, can approve or disapprove the compromise. To disapprove is to refuse the consent, and if the compromise is not approved, the contract that the Supreme Court of Spain considers perfected through the consent of the parents, would remain *ipso facto* in the air for lack of consent and would have no effect in spite of its supposed perfection. Judicial authorization is not a mechanical function that the court is obliged to perform after a compromise has been agreed upon by the father. When the Legislature provided that the compromise agreed upon by the father should have no effect without judicial authorization, it intended to do something significant and not to perform a useless and unnecessary act lacking legal force. The words thus used are quite clear, they form part of the law, they have their meaning in our language, and they cannot be disregarded by a judicial decision.

The difference between alienation and compromise, when judicial intervention is necessary, lies in the fact that in the former, judicial authorization is a prior requisite, and in the latter, the approval or disapproval may be given after the bases of the agreement have been accepted. In a compromise, the father is authorized to give his consent, but subject to the condition that the compromise agreement be approved by the court. There are two entities that intervene in this consent: paternal authority and judicial authority. Without the approval of the latter, the element necessary so that a valid consent may be present is lacking. It may be

said that both the said entities complement each other but can not be substituted for one another. The juridic bond that creates obligations and determines their enforceability does not become established by the mere consent of the father, until judicial authorization is obtained.

Let us see what Scaevola says in commenting on section 1258 of the Spanish Civil Code:

" 'Perfection of the contract' is equivalent to termination, to completion of its formation, to perfect, finished, or fully produced contract, such conception implying that from that time the agreement produces all the effects thereof, that is, the fulfillment of what is expressly agreed. By the mere concurrence of the offer and of the acceptance in regard to the object and the consideration constituting the contract, the latter becomes perfected and the parties are bound to its performance.

"This concerns the substance or essence of the contract, independently of those cases in which certain requirements are extrinsically or formally necessary for its validity (secs. 1280, 1628, 1661, 1667, 1668, 1812, 1857, 1863, and 1665); matters which do not affect the heart of the controlling principle involved in the section discussed, which is always to govern, whether alone, or in combination with the one announced, according to the explicit statement of Base 20 of the Act of May 11, 1888, that 'contracts . . . . shall continue to be subject to the principle that the mere concurrence of the wills of the contracting parties establishes the bond, even in those cases in which certain formalities are required for the transfer of property or the execution of a document . . . . '

"We speak of termination or completion as synonymous with perfection, in the sense that from the moment it occurs the juridic relations constituting the contract become definitely created and established. The contract acquires life; in a word, it is born, the period of gestation or elaboration of the rights and obligations in the minds of the parties thereto being then ended. The meeting of the minds generates obligations, correlative, in turn, to as many other rights, the union of which forms the juridic body of the contract.

"By consent the contract is perfected, and the perfection indicates the end of one period of its life and the beginning of another; that of consummation, realization, or effectiveness." (Volume 20, Commentaries on the Civil Code, pages 558 and 559.)

And Manresa, in commenting on the same section, expresses himself thus:

"I. *The perfection and the consummation of the contract.*—Successive periods or phases in the development, in the life of the contract, are its generation, perfection, and consummation, in the order in which we have enumerated them. Conforming to the order that the Code follows, not without reason, we leave for the commentary on section 1362 that all concerns the preliminary process which leads from the offer, all along the path, sometimes intricate, of the negotiations, to the precise mutual assert of the parties, which gives rise to the perfection of the contract, of which we will now speak.

"Perfection comes to mean the birth, the advent of the contract as an obligatory bond: the result of the mutual assert given. The perfection of a juridical act presupposes the concurrence of those elements which its essence demands and which produce the binding consequences that pertain thereto. That stage is attained in a contract by the mere consent; it matters little that the execution of a deed or another special form is required by law, because, aside from the fact that the fulfillment of the other obligations is valid even without that requisite, the existence of the latter only supposes that it is one more obligation; but an obligation which, by being such and enforceable, makes evident the fact that the perfection of the contract was attained by the consent in which it originated." (Volume 8, Commentaries on the Civil Code, pages 584, 585.)

Section 1210 of our Civil Code, equivalent to 1258 of the Spanish Civil Code, leaves no room for doubt. Contracts are perfected by mere consent, and from that time on the parties are bound not only to the performance of that which has been expressly stipulated, but also with respect to all the consequences which, according to the character of the contract, are in accordance with good faith, custom, and the law. After the contract is perfected, it becomes effective immediately as it acquires juridic life and is binding upon the parties thereto without the need of consummation. It is clear that the father may agree upon a compromise and that his action is valid as long as he acts in conformity with the powers granted to him by the second subdivision of section

1710 of the Civil Code; but if the contracting parties, instead of submitting the agreement to a competent court, dispense with judicial intervention, and regard the contract as final, acting accordingly, then such contract, lacking juridic life, has no efficacy whatever because it lacks the requisite of judicial authorization. The parties should be diligent and endeavor to obtain judicial sanction as soon as possible in order that the purposes of the law may be fulfilled. To hold the contrary would be equivalent to leaving to the passage of time the compliance with a requisite which found a place in the Civil Code for the benefit of minors, and its postponement for an indefinite time would defeat the spirit and purpose of the law itself.

The Supreme Court of Spain attributes reciprocal obligations to the parties to a compromise, and holds that the contract is rescindable when these obligations are left unfulfilled. The reciprocal obligation in this case consists, according to said court, in submitting the compromise for judicial authorization. We do not understand how one party can ask for rescission when such party has not fulfilled its own obligation. The reciprocal obligations to which the law refers are those that arise from the contract itself after it is perfected, and not those that are related to the requirements that are essential so that the compromise may acquire juridic life and be effective as such. It is not possible to demand the rescission of a contract that has never come into being, that has not become a contract, and that can have no legal effect. Acts done by a father in the exercise of his powers to compromise are valid; but the contract is not effective until it receives judicial sanction.

The said Supreme Court has declared, in its judgment of January 4, 1866, that "one who does not fulfill the obligation assumed by him under his compromise has no right to demand that the other party perform what he bound himself to do"; as the duties are mutual and correlative, and in its judgment of July 11, 1871, that "after a contract is

fulfilled by one of the contracting parties the other party should be compelled to fulfill, in turn, that which was agreed upon.''

Counsel for the defendant corporation maintain that the compromise agreement alleged in the new matter in its answer cannot be collaterally attacked, and they cite decisions of the Supreme Courts of Spain and of Louisiana and a decision of this Supreme Court (*Matienzo* v. *González et al.*, 26 P.R.R. 400), in which the tendency is observed to accept the doctrine that a compromise agreement is not subject to collateral attack, as held by the Supreme Court of Louisiana. This doctrine is based on substantive provisions of the law, which in Spain as well as in Louisiana and Puerto Rico, liken a compromise, which has the nature of *res judicata,* to the decision of a controversy by a court of justice.

We believe that when an essential defect appears on the fact of the compromise itself, as when it lacks judicial authorization in the cases where the same is required by law, the contract lacks validity and may be attacked collaterally without the necessity of resorting previously to an action for its annulment.

The doctrines applicable to judgments generally prohibiting collateral attack are inapplicable to agreements of compromise not followed by judicial confirmation. 12 C.J. 341.

The procedure generally sanctioned by the American courts requires judicial confirmation so that the compromise may be immune to collateral attack; our Civil Code requires judicial authorization so that the compromise may be effective, when it is the father or the mother who compromises in regard to the property or rights of a child, and the value of the subject matter exceeds $500. We believe that the doctrine that allows collateral attack should be applied when the compromise requires judicial authorization or approval and neither of these requisites has been complied with.

We quote the following excerpt from the opinion delivered by Mr. Justice Brown in the case of *Nelson* v. *Nelson,* 111 Minn. 183; 126 N.W. 731:

"We come, then, to the question whether the stipulation of settlement and dismissal may be set aside in this action, or whether proceedings in the former action should have been taken for that purpose. Counsel for defendant presented this feature of the case with much earnestness, and we have given the question serious and careful consideration, with the result that we are unable to concur in his view of the rules of law pertinent to the subject. The doctrine against collateral attack applies almost exclusively to judgments of duly constituted courts, or the proceedings and decisions of judicial or quasi judicial officers in matters within their jurisdiction. It has no application to contracts, or to stipulations or agreements in actions or proceedings not followed by judicial confirmation. All private writings, contracts, and agreements are open to attack for fraud, or for want of authority in an agent to enter into the same, whenever or wherever rights are asserted thereunder. It is unnecessary to assail them by direct proceeding. The stipulation in question was a compromise of the action, a contract not followed by judgment, and comes within the rule stated. It cannot be differentiated from an ordinary settlement and release before action is brought. In cases of that kind we have, in line with the authorities generally, uniformly held that the injured party may ignore the release, bring his action on the released cause, and, upon the coming in of an answer setting up the settlement and release, reply that it was obtained by fraud, or was otherwise unauthorized and not of binding force. *Christianson* v. *Railway Co.,* 61 Minn. 249, 63 N. W. 639; *Christianson* v. *Railway Co.,* 67 Minn. 94, 69 N. W. 640; *Peterson* v. *Railway Co.,* 36 Minn. 399, 31 N.W. 515. The stipulation, being founded upon a compromise of the action and a contract of release and discharge of defendant's liability, was, within the rule, subject to attack in this action precisely as though no provision for a dismissal of the action had been included therein. If judgment had been formally entered, it is probable that direct proceeding to set it aside would have been necessary; but no such judgment was entered until the action was out of court in plaintiff's personal dismissal. We therefore hold that it was not necessary to attack the stipulation by motion or otherwise in the former action. The authorities cited by defendant in support of the contention that the stipulation is of the same

force and effect as a judgment do not sustain the position, and our research has brought to light no case in which the rule contended for has been applied to a stipulation upon which no judgment was entered.''

The Supreme Court of Minnesota refers to agreements of compromise not followed by judicial confirmation. In the instant case we consider this doctrine as applicable and wholesome since it is the case of a contract in which a minor intervenes and which requires judicial authorization, and also because the lack of power on the part of the father to compromise without the approval of the proper district court, appears from the compromise itself.

The plaintiff, through her attorney, asks that this Court render the judgment that the trial court should have rendered, in accordance with section 306 of the Code of Civil Procedure.

In its findings of fact, the lower court says that the evidence as to whether or not the plaintiff was an employee of the defendant is on the whole conflictory, but it is an established fact that the said minor was working at the Central with the knowledge and acquiescense of the defendant, although it is alleged by the latter that he was doing the work for account of his father, Raimundo Cruz. Let us examine the evidence to see if the allegation that the accident of which Francisco Cruz was the victim was due to the negligence of the defendant corporation, at the time when the plaintiff was working for the said corporation has been proved.

The witness, Flor Cruz, stated that he is a cart driver; that about the month of May of last year (1928) he was working on the ''Mulas'' plantation of the Central Pasto Viejo, where sugar cane was grown; that Francisco Cruz was working with him on the cart and that his work was to feed cane fodder (*cohollos*) to the oxen and to gather up the cane; that a person doing this task that was being done by the child, is known as a *rabero;* that the witness and the child were employed with Luis Rivera, overseer of the cen-

tral; that the child had been working for about four or five days before the accident occurred; that the cart was going up the hill in the middle of the road; that when the event occurred the witness was carrying cane from the field to the hoisting machines; that going towards the cane-lot, in the middle of the road, there was a lane that crossed the hill and that in the middle of the hill the wheel on one side of the cart slipped because the cart was higher on one side than on the other; that the witness tried to prod the lower ox —that is, touch it with the goad—and the ox was a little slow and did not obey, and as the other ox was always more unruly, the cart overturned and caught the child underneath, and then the witness picked him up. "I was not riding," said the witness, "I was walking on the lower level prodding the yoke of oxen, and as the steer above was more unruly than the other, I prodded him with the goad and at the same time it slipped and prodded the lower one, and the lower one obeyed me (*sic*) and overturned the cart." The witness continued to testify and stated that he knew Raimundo Cruz and that the latter was not at the place of the accident; that he was in front of the house on a cane-field with a gang of workmen, at the foot of where the cane was being taken; that he saw the father when he turned over the child to him in the road, but not before; that he saw him in the house on a piece of cane-land where he was working, and called him; that the witness and Juan Martínez carried the child in their arms and the father came there and took the child.

The witness, Juan Martínez, testified that he had been working for three or four years as yoke-boy (*cuartero*); that he knows a good deal about carts and oxen; that the work of a yoke-boy consists in yoking a yoke of oxen, or two or three yoke, and the yoke-boy is the one who guides and leads them; that he knows very well how oxen behave, and that he has had experience in that line; that he was working

as yoke-boy on the "Mulas" plantation; that he had seen Francisco Cruz employed as *rabero* for four or five days, and that the name of *rabero* is given to the person who feeds cane fodder (*rabos*); that the plantation where he was doing this work was "Las Mulas," of the Central Pasto Viejo; that there were four yoke-boys and Flor Cruz was the cart-driver; that the first thing they did every day when beginning work was to go to the *corral* to yoke the oxen; that they yoked them there and they all left for the cane fields— cart-driver, *rabero,* yoke-boy, and foreman; that on the day of the accident to Francisco Cruz, the witness saw him in the morning in the *corral* yoking oxen and driving them, and afterwards he saw him behind the cart of Flor Cruz, the witness going as yoke-boy; that the driver, the yoke-boy, the *rabero,* and the foreman left the *corral*; that Flor Cruz and the child went on foot, and on arriving at a place where there was a lane, that there was a lane at the side, a slope, one ox was unruly and the other quiet, and the driver prodded the unruly ox and then the cart overturned and caught the child; that there was a great ditch in the road and the cart fell into it; that the cart overturned because the driver prodded the wrong ox, and that when he prodded it, the ox jumped and the cart overturned; that the driver made a mistake because he prodded the unruly ox, which was very unruly, and if he had not prodded him perhaps nothing would have happened to the child, because if he had not prodded it the cart would not have fallen into the hole; that the minor was going alongside the cart, and when the latter overturned, it caught him; that the road is bad, and that on previous days they had passed along that same road with the child Francisco Cruz; that they were going to the lot where the cane was to be loaded, to the same work that they had had on previous days; that the Central Pasto Viejo paid the witness $1.25 a day, and that he knows that they paid the child because no one is going to work for nothing.

Juan N. Torres testified that he was driving a cart .on the day the accident occurred; that he knows the plaintiff child but does not remember his name; that he does not remember if the accident occurred in the month of May or in the month of June; that he had lived at "Las Mulas" for a long time before the child was hurt, near the child's home; that it is true that the accident occurred while the witness was going in a cart to load it with cane, to a hill that was above the house where the witness lived; that more carts were going and that he does not remember how many there were; that he was going behind Flor Cruz; that the child was going beside Flor Cruz and Juan Martínez in front; that the witness was working with Luis Rivera, overseer of the "Mulas" plantation; that the Central Pasto Viejo paid the witness through Luis Rivera, and that he knows that the central paid the child because he was working at said central; that he is sure that the child was working at the Central Pasto Viejo because he was there working in his presence, because the central paid him also, because the child worked with Don Luis and Don Luis was also working at the Central Pasto Viejo; that he went to collect with the child and saw when they paid him the money; that a few days before the accident he was in the child's house; that the mother of the child and Luis Rivera were there, but not so the father, Raimundo Cruz, and that he heard when Don Luis told the child to go and give cane fodder (*rabos*) with Flor Cruz, that he would earn the same; that when they went. up a slope (*jardita*), he saw that Flor Cruz prodded the ox on the upper side and the other ox was a little unruly and. went on top of the other, and when he went on top, the cart turned over; that the driver prodded the ox on the upper side, the unruly one; that the cart overturned because the driver prodded the wrong ox; that the witness has been a driver for a long time; that if the ox on the lower side had been prodded, the cart would not have overturned; that the

driver drove the goad into the more unruly ox, the one on the upper side, and as it was unruly, the ox threw itself on top of the other and the cart slipped and overturned and caught the child.

Alejandrina Franco, mother of the child, testified that they moved from Río Blanco to the Mulas plantation at the suggestion of the overseer, Luis Rivera; that when her child lived in Naguabo he attended school, and that the overseer told her husband that the child would not find a school to go to and that he should put him to work; and then he told him that he should work as water boy; that they would pay him fifty cents; that he sent him to carry water to a gang of peons; that her son was carrying water for about two weeks and then Don Luis decided that on the following day he should go with Flor Cruz to feed cane fodder to the oxen; that he would pay him the same; that the child turned over to her each week the money he earned working for the Central Pasto Viejo; that she does not know with whom he was working because she did not know the foremen; that her husband, Raimundo Cruz, worked on the same plantation, but that the child did not work under his father.

Luis Rivera testified that on or about May 4, 1928, he was working on the Mulas plantation of Pasto Viejo; that he knows Raimundo Cruz and a child called Francisco Cruz, and he also knows Alejandrina Franco, and that these persons lived on the Mulas plantation; that the witness was at that time employed as the defendant's overseer, a position that he had been holding for three years; that he has not been the overseer of that plantation since April 5 of this year (1929); that the duties of the witness were to authorize all the agricultural work to be done on the plantation: weeding, plowing, cutting and gathering of cane, ditching—everything there was to be done; that the witness was the one who assigned the personnel of the "Mulas" plantation to do the various kinds of work; that in the week

from April 26 to May 3, 1928, many persons were working on the plantation; that among them Raimundo Cruz was working, and Francisco Cruz was also working with his father; that Raimundo Cruz was weeding, on a piece-work, basis and was using Francisco Cruz, under the contract, as water-boy; that it was the father who paid Francisco Cruz his wages; that the witness could not estimate the day-wages of the personnel doing piece-work; that the one who made the contract for piece-work with the overseer calculated it, and that the witness did not even make a note of the personnel; what he did was to count the personnel and to ascertain the number that he had working, and he made him a ticket for the total amount of the work; that the person making the contracts (*ajustador*) for piece-work takes a ticket and gives it to the contractor and then the latter has his people and gives a memorandum to the person making the contract, and the latter pays him the amount that he collects for the whole of that ticket; that the minor, Francisco Cruz was the one who was doing the work and Raimundo Cruz, the father, was the one who was doing piece-work, because the witness could not make a contract for piece-work with a child such as Francisco Cruz; that the child sometimes went to school and sometimes not, and went around with his father; that he saw the child playing around there and walking about; that he saw him working with his father as water-boy, working for the peons his father employed; and for that reason he says that he was working; that Raimundo Cruz devoted himself to doing piece-work in weeding, making drains, and digging ditches and if he had no piece-work, in passing cane, cutting it, and loading it on carts; that when Raimundo Cruz finished the work of weeding about the middle of the week in which the accident occurred, he sent him to passing cane; that on the day of the accident he sent him to pass cane, to the cane-lot where the carts were, carrying cane; that the

lot was near the plantation, in the upper part; that eight or ten persons were working there, one driver, and no one else; that the cane was collected and was first tossed from higher up, and it was tossed again, if necessary, until it was tossed to a low place, and the cart collected it there; that the cane was tossed until it was taken out to a place where the cart could load because the passing is done first, and after the passing, other things are done, and a car comes and gathers up the cane; that the driver orders one or two or three men to collect the cane which is made into a pile so that when the cart comes it finds the cane collected and can make more trips; that that was what Raimundo Cruz was doing on May 4, 1928, when the accident occurred, of which he learned immediately after it had occurred. Questioned by Attorney Gallardo, this witness answered that he had been in the office of Attorney Aponte to talk of the case; that Mr. Gallardo told him that he needed him as a witness and that he answered that he lived on the "Mulas" plantation and could take no action until he left there; that afterwards he would think over what he should do. Later, in answer to questions put by Mr. Aponte, he stated that he received a letter from Mr. Gallardo in which he told him that the case was set for the first day of August, and that he should come; that he was not testifying at the request of Mr. Gallardo; that his testimony is favorable to the company, since he is with the company, which is the company represented by Mr. Vendrell. Asked if Mr. Gallardo knew what he was going to testify, he answered: "Why, you will understand that one is not going to tell an enemy to come and testify. It seems to me that he did not know what I was going to testify, because I was not speaking to him about testifying."

Various pay-rolls were presented by the defendant to show that an individual named Francisco Cruz, who is not the

plaintiff, was working in the factory, and that Raimundo Cruz did piece-work. On the pay-roll for the week from April 26 to May 3, 1928, Raimundo Cruz appears as working by the day at $1.25 a day, and on May 4, the date of the accident, his name does not appear on the pay-roll.

The defendant alleges in its verified answer, that it has had no intervention, either direct or indirect, in the accident to the plaintiff minor, the proximate cause thereof being the negligence of the plaintiff's father, Raimundo Cruz, who ordered his child to mount one of the carts that were going toward one of the plantations owned by the defendant corporation. In the contract sought to be entered into between the defendant and Raimundo Cruz in representation of his child, the father declared that in order to make use of his minor child, Francisco Cruz, he ordered him to devote himself to feed cane fodder (*rabos*) to the oxen. The overseer, Luis Rivera, testified that Raimundo Cruz was doing piece-work, and that if there was no piece-work, he worked at passing or cutting cane or loading the cane-carts. Said overseer adds that during the week of the accident, when Raimundo Cruz finished the weeding he was doing by contract, he sent him to pass cane, precisely on the very day of the accident. The testimony of the overseer agrees with the pay-rolls presented by the defendant. Raimundo Cruz, far from appearing as doing piece-work, appears as working by the day on the pay-roll for the week from April 26 to May 3, 1928, and on the fourth of said month, the day of the accident, his name does not appear anywhere. On that day Luis Rivera ordered Raimundo Cruz to pass cane, which was a work in which he engaged when he had no piece-work. When Don Luis gave this order, Raimundo had already finished his piece-work in weeding. It is evident that on the date of the accident the father of the child was not doing piece-work but working by the day. On that day he was at work passing cane. Raimundo Cruz

gained no advantage by using the services of his child. The work that the child was doing at the central when the accident occurred benefited the defendant corporation exclusively. Is is shown that the minor was working with the consent and acquiescence of the defendant, as the lower court says, and that he was serving said defendant at the time the accident occurred. It is to be noted that Raimundo Cruz was not present at the place where the accident occurred. In regard to this point there is no conflict in the evidence. The driver, Flor Cruz, testified that when he, with Juan Martínez, was carrying the child in his arms, he met Raimundo working with a gang in front of his house, in a piece of cane-field. All the evidence shows, without any room for doubt, that on that day the child was not working by his father's side. The evidence itself of the defendant corporation shows that the child had been sent to feed cane fodder (*rabos*) to the oxen, although it is made to appear that it was by his father's orders.

Section 7 of Act No. 73 of 1919, regulating the work of women and children and protecting them against dangerous occupations, provides that no child under twelve years of age shall be employed or permitted to work in any gainful occupation. Section 5 of the same act, copied textually from our Organic Act, prescribes that the employment of children under fourteen years of age in any occupation injurious to the health or morals or endangering their lives or limbs is prohibited. By section 14 of that act, a penalty is imposed on every employer who violates any of its provisions. Section 3 of Act No. 75 of 1921, to regulate the employment of minors, and to provide for compulsory school attendance of the children in Puerto Rico, and for other purposes, provides, as amended in 1925, that no child shall be employed, permitted or suffered to work in or in connection with any gainful occupation, except domestic labor and work on farms and in gardens, according to the provisions of section 21 of

this act, more than six consecutive days in any one week, or more than 48 hours in any one week, or more than eight hours in any one day, or before eight o'clock in the morning, or after six o'clock in the evening of any day. According to section 1 of this act, as amended in 1925, the word "child" shall mean any person under sixteen years of age. Section 8 of the said Act of 1921 reads as follows:

"That no child of fourteen and under sixteen years of age shall be employed, permitted or suffered to work in, about, or in connection with any gainful occupation with the exception of domestic, farm and garden labor, unless his employer procures and keeps on file and accessible to any officer, inspector, or other person authorized to enforce or aid in enforcing this Act a permit to work during the school course, issued as hereinafter described, and keeps a complete list of all such children employed therein conspicuously posted in the place where such children are employed in such occupation."

Section 19 of that act imposes a penalty on any person who employs, procures, or permits a minor to be employed in violation of any of the provisions of the act.

It may be that said Act of 1921 and other similar statutes have been enacted principally for the purpose of guaranteeing the education of the child, but not so the Act of 1919, which contains provisions against dangerous occupations and has for its principal object the protection of women and children against certain occupations. All these laws prohibit the employment of minors under sixteen years of age in gainful occupations. The prohibition contained in the Act of 1919 refers to minors under twelve years, and that of 1921, as amended in 1925, contains the same prohibition in regard to minors under sixteen years, but authorizes the occupation of a child in domestic, farm, and garden labor.

Gainful occupation (*ocupación lucrativa*), according to section 15 of the Act or 1919, includes all work or labor in factories, mills, centrals, machine-shops, establishments, or

places of any kind where there is a factory or an enterprise using machinery; in ware-houses, stores, establishments or places of any kind where mercantile operations are carried on; on farms, ranches, estates, or places of any kind where agricultural enterprises, either horticultural or pasturing pursuits are followed, and in all mining or fishing enterprises.

"Plantation" includes every ranch (*hacienda*), estate, or other parcel of land where any gainful occupation is engaged in.

The English text of the paragraph which we have just copied, in defining the words "gainful occupation" includes work on "farms" and "plantations," as signifying different things. The amendment approved in 1925 excludes from the prohibition domestic work and work done on "*granjas*" and "*jardines*" (the English text uses the words "farms" and "gardens") but does not exclude work on plantations, and as this word includes every ranch, estate, or other parcel of land where any gainful occupation is engaged in; it is clear that the defendant corporation authorized, permitted, and suffered Francisco Cruz to work in an occupation prohibited by law. The Spanish text is clearer than the English text, because the latter, in establishing the exception approved in 1925, uses the words "farms" and "gardens" and the Spanish text speaks of "*granjas*" and "*jardines*." It is clearly evident that Francisco Cruz was not working either on a farm (*granja*) or in a garden.

The appellant invokes the doctrine laid down in *Rivera* v. *Ribas et al.*, 31 P.R.R. 341. In that case the Court, by a majority vote, held that the employment of children contrary to law constitutes negligence *per se*. The Court likewise declared that the occupation of feeding cane fodder to the oxen and of picking up the cane that dropped from the carts in motion is essentially dangerous. The minority of the Court favored the view that the occupation of feeding cane fodder

to the oxen is not a dangerous occupation involving negligence *per se*. Irrespective of the interpretation that may be given to this occupation from the standpoint of the danger involved, the truth is that the defendant corporation authorized, permitted and suffered Francisco Cruz, a child who was not yet ten years old, to engage, on the day of the accident, in work prohibited by law. Whatever may be the probative value of the violation of the statute, whether it is considered as negligence *per se* or as prima facie evidence of negligence, we are of the opinion that the evidence adduced shows that the defendant is liable for the accident.

The lower court tells us in its findings of fact that there is no dispute whatever as to the manner in which the accident occurred, or in regard to the fact that the child was injured when the cart fell on him. The witnesses, Juan Martínez and Juan N. Torres, testified that there was an unruly ox and that the driver who was driving the cart prodded this ox. Juan N. Torres said that the ox, as it was unruly, threw itself upon the other ox and the cart overturned; Juan Martínez stated that the ox jumped and the cart overturned and fell into a big ditch that was there. Both witnesses asserted that if the unruly ox had not been prodded, the cart would not have overturned. Flor Cruz, who was driving the cart that caused the accident, testified that he prodded the lower ox, which was a little lazy and did not obey, and as the other ox was more unruly, the cart overturned anyway. Later he stated: ''As the steer above was more unruly than the other, I prodded it with the goad, and at the same time it slipped and prodded the lower one, and the lower one obeyed me (*sic*), and overturned the cart.'' The testimony of this witness is somewhat confusing. He said that as the steer on the upper side was more unruly, he prodded it with the goad which at the same time slipped and prodded the ox below. So it seems that when the driver of the cart prodded one of

the oxen with the goad, the goad slipped and prodded the other ox, the one below, which was the quiet one, and if this is so, and he first prodded the ox on the upper side, the unruly one, and afterwards the quiet one, his testimony is not in conflict on this point with the testimony of Juan Martínez and Juan N. Torres, who stated that the said driver prodded the unruly ox.

As to the description of the place where the accident occurred, the evidence is not as clear as could be desired, but it throws enough light so that we can account for the circumstances surrounding the accident. Flor Cruz testified that the accident occurred going up the hill; that there was a lane that crossed the hill and that half-way up the hill the wheel on one side of the cart slipped because the cart was higher on one side than on the other; that he tried to prod the lower ox, which did not obey, and as the other ox was more unruly the cart overturned anyway. The witness Juan Martínez stated that it was upon arriving at a place where there was a lane, that there was a lane at the side, a declivity, that the accident occurred; that there was a big ditch in the road and the cart fell into it; that the road is bad, and that on previous days they had passed over it with Francisco Cruz. Juan N. Torres testified that the truth is that the accident occurred while he was going in a cart to load it with cane, to a hill that was above the witness's house, and that it was when they were going up a slope (*jardita*) that Flor Cruz prodded the unruly ox and the cart overturned.

The evidence shows that the driver was on foot and that when he prodded the unruly ox the cart was going up an incline and was higher on one side than on the other, and the child was at a distance where he could be reached, as he actually was reached, by the cart that overturned and fell into a ditch that there was at that place. It has been shown that the defendant was using an unruly ox; that it allowed the

child to work as feeder (*rabero*) with this ox and to pass with the cart over a bad road where there was a ditch and while the cart was going up an incline; that the accident occurred when the unruly ox was prodded; that the provisions of law were being violated by said defendant, and that all this was done in regard to a minor nine years and some months old, from whose services it was benefiting. In our judgment, all these acts clearly show the negligence of the defendant.

It remains now for us to determine the amount of the damages. The lower court, in its findings of fact, states that the child was injured when the cart fell on top of him, having suffered, as a consequence of the injuries received, a fracture at the base of the skull, an injury of a serious nature that kept him in the Presbyterian Hospital for a period of two or three months, as well as unconscious for eight or ten days, and he showed a paralysis of the left side of the face and suffered such injury to his organs of sight that it caused double vision, that is, seeing objects double, and he suffered great physical pain. Referring to the paralysis of which the lower court speaks, Dr. Segarra, the only expert who testified in this case, stated that the child cannot wink normally because there is absolute paralysis of the whole left side, and that this paralysis is of a permanent nature. The expert added that the child is in the same condition as when he saw him at the time he left the hospital. The prospects of this child are dark, "because we have two kinds of paralysis, of the face and of the forehead." The child was nine years old and enjoyed good health, and was earning fifty cents a day, according to the mother's declaration. We are of the opinion that the sum of $5,001 should be awarded to him as damages.

The judgment appealed from must be reversed, without special imposition of costs.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.