## MARY E. B. KNIGHT v. POWERS DRY GOODS COMPANY, INC.[1]

January 9, 1948.

No. 34,534.

*Maugridge S. Robb,* for appellant.
*Jayne & Chase,* for respondent.

MAGNEY, JUSTICE.

Verdict for plaintiff. Defendant appeals from an order denying its motion for judgment notwithstanding the verdict or for a new trial.

Lyman Newlin is a bookstore operator in Minneapolis. Formerly he had been employed in a similar store in Chicago. On or about February 2, 1945, he saw one Vancil Ingall standing on a street corner. He was bareheaded and carrying with one finger a box 18 to 24 inches long and about 10 inches wide and high. Newlin recognized him, having seen him in the Chicago store, and thought he was a book thief. The next day Ingall stepped into Newlin's store. He had his box with him. Newlin told his assistant to watch him, "be-

---

[1]Reported in 30 N. W. (2d) 536.

cause he is a slick operator." She watched him and "made herself almost obnoxious to him, asking could she help him." Ordinarily, prospective buyers are not pestered, the rule being that a man who buys books likes to browse. The assistant made it so uncomfortable for him that in about ten minutes he left. Newlin then called up every bookseller in the Twin Cities whom he knew, including defendant, the owner and operator of a large department store, giving them a description of the man.

"Q. Did you say as to his previous record?

\*   \*   \*   \*   \*

"A. Yes, I said I had known him, and I was now convinced he was a book thief because of this package."

Newlin did not tell them that Ingall was a vicious character and to proceed cautiously. He only told them he was a book thief, but did not advise anybody how to proceed further. When Newlin first met Ingall, the latter represented himself to be a literary critic, and Newlin said he looked the part; that he was a "big fellow, heavy set"; seemed to be well-bred and looked like an educated man; did not have the appearance of a thug or a criminal; and that when he was in the bookstore at Chicago he did not exhibit any violent propensities and treated Newlin as a perfect gentleman. Newlin came to the conclusion eventually, however, that Ingall was selling him books he had stolen. When he started to bring in high-priced medical dictionaries, Newlin told him to get out. He said that Ingall was "peeved" about this and said he would see the president of the company, but that he did not do so. Newlin was asked, "He didn't threaten to lick you?" and answered, "No, he wasn't that type of man."

The two women house detectives of defendant, one of whom was deputized by the city of Minneapolis, were notified that same day that there was a book thief in town. They had received such warnings several times before. No further information was given. Late in the afternoon they were called to the book department, and Ingall was there. Mrs. M. Louis Augur, the deputized detective,

said that he looked like a rather distinguished businessman, and that she "wanted to make sure we were watching the right party." According to her, Ingall did not look like a vicious individual, but was a rather interesting looking person; he did not appear to be a violent sort, "Far from it." Another witness testified: "He looked more like a retired minister to me than anything else." One of the detectives remained inside, and the other went outside to watch him through the window. They saw him stack the books on the floor and then shove them into the opening of his trick box. It was like watching a sleight-of-hand performance. Then he went out the door. He was stopped on the sidewalk. Mrs. Augur said to him: "Pardon me, sir, but don't you think you had better pay for those books?" He said, "I guess I will" in a very gentle, soft voice. He turned around and calmly walked ahead of her through the door into the store, showing no violence or attempt to get away, and started to turn in to the book department. Every indication was that he was going back to that department to pay for the books. Mrs. Augur then took hold of his arm and said to him: "There are too many people here. Let's go to the office, it will be less conspicuous." They walked along the aisle toward the elevator. The other detective took hold of his other arm. According to Mrs. Augur, Ingall looked "rather chagrined," but walked along quietly to the front of the elevator. While they were waiting for the elevator, Ingall suddenly threw the box and started to run. That was the first indication that he was going to be violent, and the detectives stated that they had no idea he was a vicious character. Some men employes were standing at a freight elevator nearby. Mrs. Augur called out to them once to stop him. She did not call out again, and no one else did.

Mrs. Augur, one of plaintiff's witnesses, testified that as Ingall was running down an aisle plaintiff, 67 years old, ran toward him several steps, swinging a cane at him and trying to hit him. In order to get away and protect himself, he pushed her aside with his hand. She was the only obstacle in his way. "She made herself a nuisance because she was right in everybody's way when we were

trying to hold him." She fell to the floor. She was taken to the coffee shop. While there, in the words of the witness, she "was carrying on quite a lot about that a man like that should be stopped, and if there were more people stop them there wouldn't be so much crime; she was glad she had done it and she didn't care what had happened to her, but she just felt she did her duty as a citizen, and she was glad she had her cane that day because it was great help in an emergency like that. She seemed very elated." She said she was glad she had stopped him. She was then taken to the nurse's office on the fourth floor. There she stated that "there should be a big reward out for him, and she would be the one to get the reward, she would be entitled to it because she had stopped him, otherwise he would have gotten away and we wouldn't be able to apprehend him."

Plaintiff testified:

"Just then I heard an awful noise, kind of a moaning, of a lot of women groaning and crying, so I went across the aisle there, * * *. So I was standing there and trying to find out about it, and all of a sudden this wild looking being, with his hair all disheveled, his necktie untied, was leaping on the ground this way, then he went over crossways, stood there, looked me right in the eye. * * * I was all alone. There wasn't a soul there. * * * He was kind of hiding. * * * He came along this way, leaping like a frog, jumping, jumping. When he got to the end he straightened up and went across. Right in that corner he looked at me, looked me right in the eye, and without a moment's warning he came right toward me, and I never budged from where I was standing; I never budged from that spot. * * * As he came toward me I was just terror stricken, I was so frightened I didn't know what to do because I didn't know who he was. His hair was all up; he looked like Charles Laughton of the movies. He was a fellow twice my size, almost 300 pounds; huge, far too big for any police to tackle. They refused to do it. And he was standing over there and he looked right in my eye. And he had plenty of time to get out because there was a broad aisle. And there wasn't a soul there except myself. And he came toward me. * * *

Without a moment's warning he grabbed me right across my wrist, fractured my arm. He kicked my leg so when I went to get up I was on the floor. * * * These two detectives weren't anywhere near the place. * * * And the stick went way to the ceiling, came down, sounded with a report that was just deafening. * * * When he got up to me, he got almost past me, all of a sudden he turned around, grabbed my wrist, twisted it around, and the stick went high up, just like an explosion, came down to the floor, and he kicked my leg right out of the socket. I went down on the floor and became semi-unconscious."

Plaintiff said that she was helped over to a chair and waited about half an hour before the nurse came. She said that she made no statement that she was glad she had stopped Ingall or that it was "any citizen's duty to do so"; that there was some kidding about rewards "and so forth"; that she did not try to stop him, but when he came toward her she put her hands up over her head; and that she had a ski stick in her right hand.

Dr. Harvey Nelson, plaintiff's physician, testified that plaintiff, in giving her history, stated "that she noticed a number of people chasing the thief in the bookstore in Powers, * * * and she attempted to stop him with a ski pole, and the thief grabbed her wrist with such force that it apparently fractured it. * * * My recollection is that she either tried to strike him or tried to trip him with it."

On this evidence a verdict was rendered for plaintiff.

The court charged the jury:

"* * * The defendant in this case was bound to use reasonable care to protect plaintiff as its customer from injury at the hands of vicious or lawless persons who it might bring into its store."

This instruction made it the duty of defendant to use reasonable care to protect plaintiff from the hands of a vicious person whom it might bring into the store, irrespective of whether defendant knew or should have known that the person so brought in was vicious. Until Ingall started to run, there is no evidence that defendant knew or should have known that he was vicious. The court in-

structed the jury, therefore, upon an issue upon which there was no evidence and, in addition thereto, made it defendant's bounden duty to use reasonable care to protect plaintiff, whether at the time prior to his starting to run it knew or should have known that Ingall was vicious. In our opinion, the error in giving this instruction was so material and prejudicial that a new trial should at least be granted.

Defendant urges that the evidence does not support the verdict and therefore it is entitled to judgment notwithstanding. If defendant was negligent, that negligence must have taken place before Ingall started to run. All the testimony covering the events up to the time Ingall started to run was given by witnesses produced by plaintiff, and there is no conflict in that evidence. We have stated it in considerable detail. The question, then, is whether on this undisputed evidence a verdict for plaintiff can be sustained.

Newlin, the only witness who had known Ingall prior to this day, thought, from observations he had made in Chicago, that he was a book thief. He said that he was a "big fellow, heavy set"; seemed well-bred and looked like an educated man; that he represented himself to be a literary critic and looked the part; that he did not exhibit any violent propensities nor did he have the appearance of a thug or a criminal, and that he acted the part of a perfect gentleman. In fact, when Ingall appeared in his store in Minneapolis Newlin permitted his assistant, a "very diminutive" girl, to watch him and to interfere with his browsing to such an extent that he left in a few minutes. Another of plaintiff's witnesses, Mrs. Augur, one of the store detectives, said he looked like a rather distinguished businessman, a rather interesting looking person. She said there was nothing about him that looked like a vicious individual. She was asked if he appeared to be a violent sort, and she answered: "Far from it." Opal Daggett, another witness for plaintiff, said he looked more like a retired minister than anything else. There is no evidence to the contrary. When Newlin called up defendant to tell it that there was a book thief in town, he gave a description of the man. He did not say that Ingall was a vicious character, and he

gave no advice on how to proceed with him. When Mrs. Augur stopped him on the sidewalk and asked him if he did not think he ought to pay for the books, he said in a soft, gentle voice, "I guess I will," walked calmly back into the store, and proceeded quietly until he reached the elevator. Shoplifters, according to one witness, are rather sneaky, shy sort of persons. Another one stated that "They are very quiet, inconspicuous people mostly, to mingle in with a crowd or to appear inconspicuous in the store"; that sometimes, when first stopped, they will try to run.

It is evident from the above that defendant's employes did not know they were dealing with a vicious or violent person, and there is nothing in the record to indicate that they should have so known. The undisputed evidence in the case, in our opinion, does not spell out a case of negligence. Knowledge of the fact that Ingall was a shoplifter, a type of sneak thief, was not knowledge that he was vicious, violent, or dangerous as well.

In Christianson v. C. St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641, Mr. Justice Mitchell states the rule:

"* * * If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then, of course, the act would not be negligent at all; * * *. Otherwise expressed, the law is that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen."

In Seward v. Minneapolis St. Ry. Co. 222 Minn. 454, 25 N. W. (2d) 221, adherence to this rule was stated. In view of all the circumstances disclosed by the evidence, it cannot be said that defendant's employes had any reasonable ground to anticipate that the act of taking Ingall over to the elevator would or might result in any injury to anybody. Consequently their act would not be negligent.

Order reversed and judgment ordered for defendant.