ALFRED CHRISTIANSON v. CHICAGO, ST. PAUL, MINNEAPOLIS &
OMAHA RAILWAY COMPANY.[1]

December 28, 1896.

Nos. 10,360—(118).

**Injury to Employé—Proximate Cause—Contributory Negligence—Release.**

Evidence considered, and *held* sufficient to justify the jury in finding (1) that defendant's servants were negligent; (2) that such negligence was the proximate cause of plaintiff's injury; (3) that plaintiff was not guilty of contributory negligence; (4) that he had not settled and released his claims against the defendant for damages.

**Negligence—Proximate Cause.**

Where an act is negligent, the person committing it is liable for any injury proximately resulting from it, although he could not have reasonably anticipated that injury would result in the form or way in which it did, in fact, happen.

Appeal by defendant from an order of the district court for Jackson county, P. E. Brown, J., denying a motion for a new trial, after a verdict in favor of plaintiff for $1,995.   Affirmed.

*Lorin Cray*, for appellant.

*L. F. Lammers* and *T. J. Knox*, for respondent.

MITCHELL, J.   This action, which was here on a former appeal (61 Minn. 249, 63 N. W. 639), was brought to recover for personal injuries caused by the alleged negligence of defendant's servants. The defenses interposed were (1) that defendant was not guilty of any negligence; (2) that plaintiff was guilty of contributory negligence; (3) accord and satisfaction.

The plaintiff was in defendant's employ as a section hand.   On the day in question, he and two other section men started easterly on a hand car, to meet their section foreman.   In the meantime, another section crew, with plaintiff's section foreman, had started westerly from another point, on another hand car.   When the two cars came within a short distance of each other, those on the west-bound sig-

naled those on the east-bound car to go back. Thereupon those on the latter car turned back, and both cars proceeded westerly, the car on which plaintiff was going ahead, and the other car following. It appears from the evidence that those on the rear car had, before starting out that morning, imbibed several drinks of whisky; and that, while both cars were going westerly, some of them once or twice signaled to those on the forward car as if wanting them to go faster. The only significance of this is that it may in part, at least, account for the conduct of those on the rear car.

This part of the railroad was a downgrade of from 52 to 58 feet to the mile, and the track was wet and somewhat slippery. The cars were running down this grade at a rate of speed variously estimated at from 10 to 20 miles an hour. The front car, on which was plaintiff, was of old style, not capable of as great a rate of speed as the rear car; and, owing to the nature of its gearing, the handles attached to the lever moved very rapidly; so much so that it was difficult for one standing on the car to hold on to them. Plaintiff was standing on the rear end of the car, with nothing to hold on to except these handles. The other two men were on the front end of the car where the brake was. The usual distance at which hand cars kept apart, according to the rules of the company, was "three telegraph poles," which would be 540 feet. At the rate of speed at which it was going, the rear car could not have been brought to a stop by the application of the brake in less than 100 feet. The cars had traveled in this way about a mile and a quarter, the rear car gaining on the forward one, until it got within 60 feet of it.

The plaintiff testified that at this point he looked back, and, seeing the other car so near, and going so fast, became dizzy, lost his balance, and fell off. It is perhaps unimportant whether his fall was the result of fright caused by seeing the other rapidly moving car so near, or whether he accidentally lost his hold on the handle of the lever, and lost his balance. The fact is undisputed that he did fall off. We think the evidence shows that, after the men on the rear car saw him fall, they did all they could to stop their car; but going, as they were, at so great a rate of speed, and being within 60 feet of the front car, it was impossible for them to avoid colliding with the plaintiff. The result was that the car ran upon him while lying on the track, and inflicted very severe injuries.

We fail to discover any evidence of contributory negligence on plaintiff's part. The only thing which it is suggested that he ought to have done was to have made some effort to slacken the speed of the car on which he was riding. As the most imminent source of danger would seem to have been the close proximity of the rear car, it is not apparent how this would have helped matters. Moreover, it appears that plaintiff was an ignorant man, with little or no experience in railroad work; and that those on the rear car, of whom his own foreman was one, were signaling the front car to go faster. The very most that can be claimed for the evidence is that the question of plaintiff's contributory negligence was for the jury.

2. That, under the evidence, the question of the negligence of those on the rear car was for the jury, we have no doubt. The usual practice, in accordance with the rules of the company, for hand cars, when going in the same direction, to maintain a distance between them of "three telegraph poles," was founded upon the plainest dictates of common prudence. The faster the cars were going, and the greater the distance required to stop the rear car, the greater was the necessity for the observance of this rule, so as to avoid injury in case of accident to the front car or those riding upon it. But in this case, although the cars were going at a high rate of speed on the down-grade and a slippery track, those on the rear car allowed it to come within only a little over half the distance of the front car in which they could have stopped had any accident befallen the front car or its occupants. The jury were amply justified in finding that, in so doing, the occupants of the rear car were guilty of negligence.

3. The main contention, however, of defendant's counsel, is that, conceding that those on the rear car were negligent, yet plaintiff's injuries were not the proximate result of such negligence; or, perhaps to state his position more accurately, that it is not enough to entitle plaintiff to recover that his injuries were the natural consequence of this negligence, but that it must also appear that, under all the circumstances, it might have been reasonably anticipated that such injury would result. With this legal premise assumed, counsel argues that those on the rear car could not have reasonably anticipated that plaintiff would fall from the car.

It is laid down in many cases and by some text writers that, in order to warrant a finding that negligence (not wanton) is the prox-

imate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligent act, and that it (the injury) was such as might or ought, in the light of attending circumstances, to have been anticipated. Such or similar statements of law have been inadvertently borrowed and repeated in some of the decisions of this court, but never, we think, where the precise point now under consideration was involved. Hence such statements are mere obiter. The doctrine contended for by counsel would establish practically the same rule of damages resulting from tort as is applied to damages resulting from breach of contract, under the familiar doctrine of Hadley v. Baxendale, 9 Exch. 341. This mode of stating the law is misleading, if not positively inaccurate. It confounds and mixes the definition of "negligence" with that of "proximate cause."

What a man may reasonably anticipate is important, and may be decisive, in determining whether an act is negligent, but is not at all decisive in determining whether that act is the proximate cause of an injury which ensues. If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then, of course, the act would not be negligent at all; but, if the act itself is negligent, then the person guilty of it is equally liable for all its natural and proximate consequences, whether he could have foreseen them or not. Otherwise expressed, the law is that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen. Consequences which follow in unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original wrongdoer is responsible, even though he could not have foreseen the particular results which did follow. 1 Bevan, Neg. 97; Hill v. Winsor, 118 Mass. 251; Smith v. Railway Co., L. R. 6 C. P. 14. For citation of cases on this question, see 16 Am. & Eng. Enc. Law, 436 et seq.; also, Shearman & R. Neg. § 28 et seq.

Tested by this rule, we think that it is clear that the negligence of those on the rear car was the proximate cause of plaintiff's injuries; at least, that the evidence justified the jury in so finding. Counsel admitted on the argument that if, by derailment or other

accident, the front car had been suddenly stopped, and a collision and consequent injuries to plaintiff had resulted, the negligence of those on the rear car would have been the proximate cause. But we can see no difference in principle between the case supposed and the present case. The causal connection between the negligent act and the resulting injury would be the same in both cases. The only possible difference is that it might be anticipated that the sudden stoppage of the car was more likely to happen than the falling of one of its occupants upon the track.

4. The only remaining question is whether the evidence justified the verdict upon the issue of accord and satisfaction.

It stands practically undisputed that, prior to the commencement of this action, the plaintiff received from the defendant $25, and signed a formal instrument in writing releasing and discharging the defendant from all claims or demands, of every name and nature, arising or to grow out of the injuries received by being struck by the hand car. The substance of his testimony is to the effect that he was told that the railroad company was giving him the $25 "because he was poor," or "out of kindness," and that he was told and believed that the paper which he signed was merely a receipt for that sum of money, and that he did not understand that it was a release of his claims against the defendant. This excuse is so often resorted to as a means of avoiding a settlement whenever the party subsequently thinks or is told by some interested party that he has settled too cheaply, that it is always to be scrutinized with great care. The mere fact that a man has made a poor bargain is no ground for setting it aside. Neither can a settlement of a controversy be avoided because of a mistaken conception of its effect by one of the parties, unless it be shown that he was induced to agree to it by some act of the other party which would amount to a fraud upon his rights; and where a party has, for a valuable consideration, executed a solemn instrument of release, there ought to be pretty strong and clear evidence impeaching it to warrant a court or jury in avoiding it.

The evidence tends to show that plaintiff is quite an ignorant man; and, if we are to judge from his testimony contained in the record, so weak intellectually as to be almost imbecile. Whether this is strictly true, or whether his ignorance and forgetfulness were partly simulated for effect, the court and jury, who saw and heard him, were

much better judges than we. Among the injuries which he received were very severe ones on the head; and there was some evidence tending to show that these had impaired his mind down to the time of trial, although it is true that there was evidence to the contrary. When he was injured, he was carried to his boarding place at the house of defendant's section foreman, where he was confined to his bed for about 13 weeks, during which time he was attended by the defendant's surgeon, and waited on by one of defendant's section men, in the capacity of nurse. He was apparently a man without relatives or advisers, and during his long illness does not appear to have come in contact with any one except the physician, nurse, and the section foreman at whose house he was. We do not refer to these facts as implying any wrongdoing on part of the defendant, but merely for the purpose of characterizing plaintiff's condition and surroundings when he executed the release.

· It does not appear that he had ever as much as considered the question of his claim against the defendant, or that there had been any negotiations whatever on the subject between the parties. In this condition of affairs, while plaintiff was still confined to his bed, and about six weeks after the accident, the defendant's claim agent went to the section foreman's house with a draft for $25, and a formal instrument of release already prepared, and, through the section foreman as interpreter (for plaintiff could not speak or read English), tendered the $25 for plaintiff's acceptance, and this instrument of release for his signature. Of course, if the defendant was liable at all to the plaintiff, the sum tendered was a most inadequate trifle compared with what he was entitled to. This of itself is not sufficient ground for avoiding a settlement, but we think it is a circumstance entitled to some weight in determining whether there was any fraudulent overreaching or unfair advantage taken of plaintiff's condition in securing his signature to the release, and as to whether he understood that he was releasing all claim against the company. It does not appear that there were any negotiations at this interview as to how much defendant should pay; and although, as already stated, the amount tendered was grossly inadequate if defendant was liable for anything, yet, according to defendant's witnesses, plaintiff accepted it without as much as making a suggestion that he ought to have more.

The strongest evidence against the plaintiff is the testimony of several witnesses that he afterwards made statements to the effect that he had settled with the company, or that, if he had not settled, he could recover big money, etc. Some of these statements he denies, and as to others he testified that he did not remember. But there is one fact which would considerably detract from the force of these statements even if made. Most of them were made after this action was brought, and after the defendant had set up this release as a defense. Hence there is room for the hypothesis that the statements had reference to the effect upon the result of the action of the release by which the company claimed he had settled, rather than an admission as to what he had, in fact, done.

It is impossible, as well as impracticable, to attempt to state all the evidence, direct and circumstantial, bearing on the issue; but our conclusion is that, notwithstanding the testimony of the section foreman, corroborated by the section man, that he did fully and correctly translate and explain the release to the plaintiff, and that he seemed to understand it, the evidence upon the issue of accord and satisfaction made a case for the jury.

Order affirmed.