(No. 48782.—

EMMA M. RENSLOW, Indiv. and as Mother and Next Friend of Leah Ann Renslow, a Minor, Appellee, v. MENNONITE HOSPITAL et al., Appellants.

*Opinion filed Aug. 8, 1977.—Rehearing denied Oct. 3, 1977.*

DOOLEY, J., concurring.
WARD, C.J., and UNDERWOOD and RYAN, JJ., dissenting.

Heyl, Royster, Voelker & Allen, of Peoria (Lyle W. Allen and B. Douglas Stephens, Jr., of counsel), for appellant Mennonite Hospital.

Costigan, Wollrab, Fraker, Wochner & Neirynck, of Bloomington, for appellant Hans Stroink.

Strodel & Kingery, of Peoria (Robert C. Strodel and Edward R. Durree, of counsel), for appellee.

MR. JUSTICE MORAN delivered the decision of the court and the following opinion in which MR. JUSTICE GOLDENHERSH and MR. JUSTICE CLARK join:

This is a negligence action brought by a mother

individually and on behalf of her minor daughter, Leah Ann Renslow, against defendants, a hospital and its director of laboratories. The trial court dismissed that portion of the complaint which sought damages for the minor (hereinafter, plaintiff), concluding that it had failed to state a cause of action. An appeal under Supreme Court Rule 304(a) (58 Ill. 2d R. 304(a)) was perfected. The appellate court reversed the trial court (40 Ill. App. 3d 234) and issued a certificate of importance. Only the minor plaintiff's cause of action is before us.

There is but one issue: Does a child, not conceived at the time negligent acts were committed against its mother, have a cause of action against the tortfeasors for its injuries resulting from their conduct?

Plaintiff's six-count complaint for negligence and willful and wanton misconduct alleges that in October of 1965, when her mother was 13 years of age, the defendants, on two occasions, negligently transfused her mother with 500 cubic centimeters of Rh-positive blood. The mother's Rh-negative blood was incompatible with, and was sensitized by, the Rh-positive blood. Her mother had no knowledge of an adverse reaction from the transfusions and did not know she had been improperly transfused or that her blood had been sensitized. In December 1973 she first discovered her condition when a routine blood screening was ordered by her physician in the course of prenatal care. Plaintiff further asserts that the defendants discovered they had administered the incompatible blood, but at no time notified her mother or the mother's family.

The resulting sensitization of the mother's blood allegedly caused prenatal damage to plaintiff's hemolitic processes, which put her life in jeopardy and necessitated her induced premature birth. Plaintiff was born on March 25, 1974, jaundiced and suffering from hyperbilirubinemia. She required an immediate, complete exchange transfusion of her blood and another such transfusion

shortly thereafter. It is further alleged that, as a result of the defendants' acts, plaintiff suffers from permanent damage to various organs, her brain, and her nervous system.

The trial court dismissed plaintiff's cause of action because she was not "at the time of the alleged infliction of the injury conceived." The Fourth District Appellate Court, in a careful and well-reasoned opinion, emphasized that the defendants were a doctor and a hospital, and held that there was no showing "that the defendants could not reasonably have foreseen that the teenage girl would later marry and bear a child and that the child would be injured as the result of the improper blood transfusion." (40 Ill. App. 3d 234, 239.) The court correctly assessed the distinction between this case and previous cases permitting suit for prenatal injuries. Here, the negligent force, which had its impact upon the infant in its prenatal state, was set in motion years prior to plaintiff's conception. The court observed that in other types of tort cases "liability has not been barred because the allegedly wrongful conduct occurred long before the resultant injury [when] duty and causation can be established." (40 Ill. App. 3d 234, 239.) Agreeing with the conclusion reached in *Jorgensen v. Meade Johnson Laboratories, Inc.* (10th Cir. 1973), 483 F.2d 237, the appellate court found no reason to deny a cause of action to a person simply because he had not yet been conceived at the time of the wrongful conduct.

In 1884, Mr. Justice Holmes rendered a landmark decision, *Dietrich v. Inhabitants of Northhampton* (1884), 138 Mass. 14, 52 Am. R. 242, denying an action for the wrongful death of a child which did not survive its premature birth. This court, in *Allaire v. St. Luke's Hospital* (1900), 184 Ill. 359, followed *Dietrich* by holding that an action for injuries could not be maintained by a plaintiff who at the time of the injury was a prenatal infant with no separate legal existence. Mr. Justice Boggs'

dissent urged that it was "sacrificing truth to a mere theoretical abstraction to say an injury was not to the child but wholly to the mother," when the fetus was independently viable at the time of the injury. (184 Ill. 359, 370.) Mr. Justice Boggs pointed out that it was clearly demonstrable that "at a period of gestation in advance of *** parturition the foetus is capable of independent and separate life, and that though within the [mother's body] it is not merely a part of her body, for her body may die in all of its parts and the child remain alive and capable of maintaining life when separated from the dead body of the mother." The cases for the next 46 years after *Allaire* uniformly denied recovery to the prenatally injured plaintiff. Nevertheless, the impact of Mr. Justice Boggs' dissent eventually turned the tide toward prenatal recovery. *Bonbrest v. Kotz* (D.D.C. 1946), 65 F. Supp. 138, was the first decision to recognize a common law right of action for prenatal injuries. It relied heavily on Mr. Justice Boggs' reasoning—that an infant should be recognized as having a legal existence separate from its mother's at such time as it was capable of sustaining life separate from her. After *Bonbrest,* there followed what was perhaps the most rapid reversal of a common law tradition, a turnabout documented by this court and others at length. (See *Amann v. Faidy* (1953), 415 Ill. 422, *Chrisafogeorgis v. Brandenberg* (1973), 55 Ill. 2d 368, Prosser, Torts, sec. 55, at 335-38 (4th ed. 1971); Annot., 40 A.L.R.3d 1222-71 (1971).) This court, in *Amann v. Faidy* (1953), 415 Ill. 422, 432, overruled *Allaire* and held that there is a right of action for the wrongful death of a viable child, injured *in utero,* who is born alive but thereafter dies. *Rodriguez v. Patti* (1953), 415 Ill. 496, extended a common law right of action for personal injuries to an infant viable when wrongfully injured *in utero.* In *Chrisafogeorgis v. Brandenberg* (1973), 55 Ill. 2d 368, this rationale was further extended to permit a

wrongful death action for a viable child wrongfully injured *in utero* and thereafter born dead. By 1972, the initial barriers to a right of action for injury inflicted prenatally had been removed in each jurisdiction where the question had arisen. Comment, *Wrongful Birth, the Emerging Status of a New Tort,* 8 St. Mary's L.J. 140, 141 n.5 (1976).

Although we have not decided whether a surviving infant has a right of action for injuries sustained *in utero* during a previable state of its development, our appellate courts have answered that question in the affirmative. *Sana v. Brown* (1962), 35 Ill. App. 2d 425; *Daley v. Meier* (1961), 33 Ill. App. 2d 218. See also *Rapp v. Hiemenz* (1969), 107 Ill. App. 2d 382, where an action for wrongful death as the result of prenatal injuries to a previable fetus, born dead, was denied.

The complaint in the case *sub judice* contains no allegation that the plaintiff was viable when her injuries were sustained. We, therefore, must consider whether the plaintiff must allege that she was viable at the time her injuries were sustained.

The rule permitting a cause of action only where the child is viable at the time of the injury has been criticized as a "most unsatisfactory criterion, since [viability] is a relative matter, depending on the health of mother and child and many other matters in addition to the stage of development." (Prosser, Torts sec. 55, at 337 (4th ed. 1971). See Comment, *Negligence and the Unborn Child: A Time for Change,* 18 S. Dak. L. Rev. 204, 213-14 (1973); *Smith v. Brennan* (1960), 31 N.J. 353, 366, 157 A.2d 497, 504.) In addition to the length of pregnancy, viability depends on other factors which include the weight and race of the child and the available life-sustaining techniques. (See Comment, *Negligence and the Unborn Child,* 18 S. Dak. L. Rev. 204, 215-16 (1973).) Furthermore, it has been pointed out that denial of claims for injuries to the previable fetus may indeed cut off some of the most

meritorious claims, for there is substantial medical authority that congenital structural defects caused by factors in the prenatal environment can be sustained only early in the previable stages. (Note, *The Impact of Medical Knowledge on the Law Relating to Prenatal Injuries,* 110 U. Pa. L. Rev. 554, 563 (1962).) Recently, those courts which have considered the question have rejected viability as the deciding factor. (Prosser, Torts sec. 55, at 337 (4th ed. 1971); Annot., 40 A.L.R.3d 1222, 1230 (1971).) Upon reconsideration, we henceforth reject viability as a criterion to a common law action for prenatal injuries. Thus the failure to allege that plaintiff was viable at the time she sustained her injuries does not bar this action. This conclusion, however, does not fully answer the ultimate question of whether a cause of action exists on behalf of a live born infant, although the infant's injuries resulted from a negligent act occuring prior to her conception. The defendants assert they owed no duty to plaintiff because her injuries were not reasonably foreseeable at the time of the act. The appellate court found this contention erroneous.

The basic understanding of Rh-negative and Rh-positive effects upon hemolitic disease of the newborn has been a medical fact since the 1940's. (N. Eastman, Williams Obstetrics 1073-74 (12th ed. 1961).) It has long been known that sensitization occurs in 90% of Rh-negative women who have received multiple transfusions of Rh-positive blood (W. Nelson, Textbook of Pediatrics 1034 (8th ed. 1964)), and that about 85% of white Americans and a higher percentage of American Negroes and Chinese are Rh-positive (N. Eastman, Williams Obstetrics 1074, 1076, 1078 (12th ed. 1961)). It has been likewise long known that the Rh-positive fetus of an Rh-negative woman previously sensitized is "at high risk." (S. Robbins, Pathologic Basis of Disease 557 (1974).) Thus, it has been pointed out that "it must be an absolute

rule that Rh-positive blood is never transfused to an Rh-negative female who is below the age of menopause." (P. Mollison, Blood Transfusion in Clinical Medicine 418 (1961).) For these reasons, routine Rh typing has been established practice since at least 1961. (N. Eastman, Williams Obstetrics 1080 (12th ed. 1961).) Defendants herein are a doctor and a hospital. At this stage of the proceedings, with the information presented, we are not prepared to conclude that the harm caused plaintiff was not reasonably foreseeable.

Because the appellate court found the risk of harm reasonably foreseeable, it assumed duty was established, and concluded that the delay between the act and the injury was not a bar to the action.

The implication in the appellate court's opinion that duty and foreseeability are identical in scope is not altogether correct. In *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 375, it was pointed out that "the existence of a legal duty is not to be bottomed on the factor of foreseeability alone." There, quoted with approval, was Dean Leon Green's observation:

> " ' "[H]owever valuable the foreseeability formula may be in aiding a jury or judge to reach a decision on the negligence issue, it is altogether inadequate for use by the judge as a basis of determining the duty issue and its scope. The duty issue, being one of law, is broad in its implication; the negligence issue is confined to the particular case and has no implications for other cases. There are many factors other than foreseeability that may condition a judge's imposing or not imposing a duty in the particular case ***." Green, Foreseeability in Negligence Law, 61 Colum. L. Rev. 1401, 1417-18.' " (56 Ill. 2d 372, 375.)

*Cunis* questioned whether duty was limited by the scope

of foreseeability. It was there held that no legal duty arises unless harm is reasonably foreseeable. Presented here is another aspect of that question: Are there areas of foreseeable harm in which no duty arises? In some instances, the answer is clearly "Yes." The law has as yet created no duty to save a person from drowning before one's eyes, though a boat and rope be at hand. Where a third person is foreseeably injured by the shock of witnessing another harmed or imperiled by a tortfeasor, the courts have been reluctant to find a duty to the third person. Prosser, Torts sec. 56, at 340, sec. 55, at 334 (4th ed. 1971).

Historically, negligence could not be founded upon the breach of a duty owed only to some person other than the plaintiff. (Prosser, Torts sec. 53, at 325 (4th ed. 1971). But see *Piper v. Hoard* (1887), 107 N.Y. 73, 13 N.E. 626, and James, *Scope of Duty in Negligence Cases,* 47 Nw. U. L. Rev. 778, 788-89 (1953).) Holmes' *Dietrich* and its progeny indicate this duty could be owed only to one with a legally identifiable existence. "[N] egligence in the air, so to speak, will not do." (Pollock, Torts 361 (14th ed. 1939).) As medical science progressed, the courts took notice that a fetus is a separate human entity prior to birth. It is by now commonly accepted that at conception the egg and sperm unite to jointly provide the genetic material requisite for human life. Thus, various courts have gradually come to recognize that the embryo, from the moment of conception, is a separate organism that can be compensated for negligently inflicted prenatal harm. (See, *e.g., Sinkler v. Kneale* (1960), 401 Pa. 267, 273, 164 A.2d 93, 96; *Smith v. Brennan* (1960), 31 N.J. 353, 366, 164 A.2d 497, 504; *Bennett v. Hymers* (1958), 101 N.H. 483, 485, 147 A.2d 108, 110; *Kelly v. Gregory* (1953), 282 App. Div. 542, 544, 125 N.Y.S.2d 696, 698.) In the case at bar, the wrongful conduct took place prior to plaintiff's conception; the plaintiff at the time of the conduct was in

no sense a separate entity to whom the traditional duty of care could be owed. Plaintiff herein asks us to reexamine our notions of duty, and to find, in essence, a contingent prospective duty to a child not yet conceived but foreseeably harmed by a breach of duty to the child's mother.

Various commentators have criticized the concept of duty and have pointed out, we think correctly, that " 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Prosser, Torts sec. 53, at 325-26 (4th ed. 1971). See Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 15 (1953); White, *The Right of Recovery for Prenatal Injuries,* 12 La. L. Rev. 383, 401 (1952).

We are aware that two recent cases, *Jorgensen v. Meade Johnson Laboratories, Inc.* (10th Cir. 1973), 483 F.2d 237, and *Park v. Chessin* (Sup. Ct. Queens County 1976), 88 Misc. 2d 222, 387 N.Y.S.2d 204, have focused upon causation, rather than upon traditional concepts of duty, in permitting a cause of action based on wrongful conduct prior to the plaintiff's conception. (See generally *Sylvia v. Gobeille* (1966), 101 R.I. 76, 79, 220 A.2d 222, 224; *Sinkler v. Kneale* (1960), 401 Pa. 267, 273, 164 A.2d 93, 96.) It has been aptly observed, however, that "[c]ausation cannot be the answer; in a very real sense the consequences of an act go forward to eternity, and back to the beginning of the world. Any attempt to impose responsibility on such a basis would result in infinite liability for all wrongful acts, which would 'set society on edge and fill the courts with endless litigation.' " (Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 24 (1953).) Thus, policy lines, to some extent arbitrary, must be drawn to narrow an area of actionable causation. We see no inherent advantage to discarding the policy lines, defined traditionally as "duty," in favor of new

policy lines which would be necessary to circumscribe actionable causation.

We reaffirm the utility of the concept of duty as a means by which to direct and control the course of the common law. But examples of changing notions of legal duty in the area of products liability, as well as the progressive expansion of duty in prenatal cases already documented, demonstrate that duty is not a static concept.

This court has long recognized that a duty may exist to one foreseeably harmed though he be unknown and remote in time and place. (*Wintersteen v. National Cooperage & Woodenware Co.* (1935), 361 Ill. 95, 103. See generally *Skinner v. Anderson* (1967), 38 Ill. 2d 455.) Also, derivative actions, such as those of a husband or parent for the loss of the wife's or child's services, demonstrate that the law has long recognized that a wrong done to one person may invade the protected rights of one who is intimately related to the first. (See *Dini v. Naiditch* (1960), 20 Ill. 2d 406.) In these cases, because of the nature of the relationship between the parties harmed, the law recognizes a limited area of transferred negligence. Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 20-22 (1953).

The cases allowing relief to an infant for injuries incurred in its previable state make it clear that a defendant may be held liable to a person whose existence was not apparent at the time of his act. We therefore find it illogical to bar relief for an act done prior to conception where the defendant would be liable for this same conduct had the child, unbeknownst to him, been conceived prior to his act. We believe that there is a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother.

The extension of duty in such a case is further supported by sound policy considerations. Medical science

has developed various techniques which can mitigate or, in some cases, totally alleviate a child's prenatal harm. In light of these substantial medical advances it seems to us that sound social policy requires the extension of duty in this case.

The defendants assert that the need for an end to responsibility, short of perpetual liability for a single wrongful act, dictates that a duty for preconception torts not be imposed. They raise the specter of successive generations of plaintiffs complaining against a single defendant for harm caused by genetic damage done an ancestor in a nuclear accident. While we are aware that there may be similar potential for perpetual claims arising from chemical accident or long-term radiation exposure (see Comment, *Radiation and Preconception Injuries: Some Interesting Problems in Tort Law,* 28 Sw. L.J. 414 (1974)), the case at bar is clearly distinguishable. The damage alleged is not, by its nature, self-perpetuating, nor is the plaintiff a remote descendant. We feel confident that when such a case is presented, the judiciary will effectively exercise its traditional role of drawing rational distinctions, consonant with current perceptions of justice, between harms which are compensable and those which are not.

The problem of defending stale claims is also asserted by defendants. They remind us that it is possible that a woman, herself a child when injured by the tortfeasor, could late in life bear an injured child, and that this child, under the present statute of limitations, could wait until majority to bring suit. We think the likelihood of these circumstances occurring is not sufficient reason to bar all suits for reasonably foreseeable injury from preconception torts. Furthermore, the potential for a stale claim is inherent in the extended statute of limitations for a minor's personal injury action and in our adoption of the discovery rule in certain areas. (See *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1975),

61 Ill. 2d 129; *Berry v. G.D. Searle & Co.* (1974), 56 Ill. 2d 548; *Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32; *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418; *Rozny v. Marnul* (1969), 43 Ill. 2d 54.) The persuasiveness of defendants' argument further loses force where, as here, suit is brought on behalf of the minor plaintiff shortly after birth.

Logic and sound policy require a finding of legal duty in this case. While the result we reach has not yet been recognized widely, we note that various courts and commentators have asserted that it is not necessary that the legal duty be owed to one in existence at the time of the wrongful act. (See *Piper v. Hoard* (1887), 107 N.Y. 73, 13 N.E. 626; *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240; *Jorgensen v. Meade Johnson Laboratories, Inc.* (10th Cir. 1973), 483 F.2d 237; *Park v. Chessin* (Sup. Ct. Queens County 1976), 88 Misc. 2d 222, 387 N.Y.S.2d 204. See also James, *Scope of Duty in Negligence Cases*, 47 Nw. U. L. Rev. 778, 788-89 (1953); Note, *The Impact of Medical Knowledge on the Law Relating to Prenatal Injuries*, 110 U. Pa. L. Rev. 554, 566 n.77 (1962).) (The Scottish Law Commission, in 1973, in response to a question posed by the Lord Advocate of the day, concluded that under present Scottish law redress for prenatal injury is competent even where the defendant's acts occurred prior to conception. See Case and Comment, *Report of the Scottish Law Commission on Antenatal Injury*, 1974 Jur. Rev. 83.)

Since the liability announced herein represents an extension of duty to a new class of plaintiffs, we hold that it be given prospective application. Therefore, except as to the plaintiff herein, the rule shall apply only to cases arising out of future conduct. *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, 26-27.

The decision of the appellate court, reversing the trial court's dismissal of this claim for failure to state a cause of

action, is therefore affirmed and the cause remanded to the trial court for further proceedings.

*Affirmed and remanded.*

MR. JUSTICE DOOLEY, concurring in the decision:

I agree with the conclusion reached by the majority, namely, that the child has a cause of action for a wrong committed prior to her existence. While this may be a new issue, it is a simple one as shall be made manifest. The dissenting opinions would make it appear that to allow a right of action means the penetration of outer space in the world of law. These opinions justify some comment on our function.

Holmes noted that "the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage." Holmes, *The Path of The Law*, 10 Harv. L. Rev. 457, 467 (1897).

Simply because the question is new does not mean that it is invalid. Such an attitude is hardly consistent with our duty. In the 18th century Blackstone observed: "For wherever the common law gives a right or prohibits an injury, it also gives a remedy by action; and, therefore, wherever a new injury is done, a new method of remedy must be pursued." (3 W. Blackstone, Commentaries *123.) That admonition is as vital today as it was then. It is life itself which creates new problems. So is it life itself which determines what particular interest will outweigh another. The judicial process by nature is a scheme of evaluating the varying forces which make society.

Professor Corbin, whose thinking was reflected by Cardozo, expressed his concept of the judicial function thus: "It is the function of our courts to keep the doctrines up to date with the *mores* by continual restatement and by giving them a continually new content. This is judicial legislation, and the judge legislates at his peril. Nevertheless, it is the necessity and duty of such

legislation that gives to judicial office its highest honor: and no brave and honest judge shirks the duty or fears the peril." Comment, *The Offer of an Act for a Promise,* 29 Yale L.J. 767, 771 (1920).

Pound's appraisal was similar. He considered the decision of a court a process of social engineering involving the developments of principle. His description of the objective of this process was "(1) to paint a process of legal social engineering as a part of the whole process of social control; (2) to set off the part of the field of the legal order appropriate to intelligence, involving repetition, calling for rule or for logical development of principle, from the part appropriate to intuition, involving unique situations, calling for standards and for individualized application; (3) to portray a balance between decision of the actual cause and elaboration of a precedent, in which, subsuming the claims of the parties under generalized social claims, as much of the latter will be given effect as is possible; and (4) to induce a consciousness of the role of ideal pictures of the social and legal order both in decision and in declaring the law." (Pound, *The Theory of Judicial Decision,* 36 Harv. L. Rev. 940, 958 (1923).) Making or finding law, call it what you will, presupposes a mental picture of what one is doing and why he is doing it.

Obviously courts create law. If it were otherwise the common law would be as out of touch with life as is a corpse. Courts must take an active part in the development of the common law, although this may mean creativeness.

Precedents treating prenatal wrongs, cases involving wrongs to persons not conceived, as well as the rule of foreseeability, dictate our duty here. We note there is no common law principle which prohibits recovery for a wrong which took place prior to the conception of the injured person. It would be a reflection upon the common law to attribute to it an inability to function under such

circumstances. We must remember that the body of law is not a repository of stagnant problems of society but a vital, moving force which deals with the current problems of society. This court in *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 81, stated:

"The common law has established itself in the history of jurisprudence because of its flexibility in its recognition of and adaptation to changing times and mores; and, as adopted by our legislature, 'is a system of elementary rules and of general declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions and the exigencies and usages of the country.' (*Amann v. Faidy,* 415 Ill. 422; *Kreitz v. Behrensmeyer,* 149 Ill. 496.)"

While we are aware that prenatal injury cases do not involve wrongs done prior to conception, they follow the course charted by this court since 1953, when in *Amann v. Faidy* (1953), 415 Ill. 422, it recognized a right of action under the wrongful death statute for the death of an infant who, while in a viable condition, sustained a prenatal injury causing death after being born alive.

A further extension of *Amann* occurred in 1973 when *Chrisafogeorgis v. Brandenberg,* 55 Ill. 2d 368, held a wrongful death action could be maintained for a stillborn child who sustained injuries while a viable fetus. This court specifically recognized the unborn fetus was a person within the meaning of the wrongful death statute. The holding was described as not only "consistent with *Amann* but is a reasonable and natural development of the holding." 55 Ill. 2d 368, 374.

*Jorgensen v. Meade Johnson Laboratories, Inc.* (10th Cir. 1973), 483 F.2d 237, is highly pertinent and persuasive of the question before us. There the mother

sustained an alteration of her chromosome structure as a result of oral contraceptives prior to the conception of twin daughters. This alteration in the chromosome structure, according to the complaint, proximately caused a Mongoloid deformity in the fetus during the developmental period. It caused severe personal injury in the case of one daughter and death in the case of the other after a period of 3½ years. With due deference to Mr. Justice Moran, this case does not focus "upon causation, rather than upon traditional concepts of duty."

The district court dismissed the complaint. The court of appeals reversed and remanded holding a person not in being at the time of the tortious conduct had a right of action.

> "If the view prevailed that tortious conduct occurring prior to conception is not actionable in behalf of an infant ultimately injured by the wrong, then an infant suffering personal injury from a defective food product, manufactured before his conception, would be without remedy." 483 F.2d 237, 240.

Mr. Justice Underwood, dissenting, would distinguish *Jorgensen v. Meade Johnson Laboratories, Inc.* (10th Cir. 1973), 483 F.2d 237, on the basis that it was a strict liability in tort action. But such fact in nowise changes the question before the court, whether a person not in being at the time of the wrongful act has a cause of action. If Leah's mother's condition was brought about by a defective drug, the identical question in a strict liability in tort action would be before us.

Nor does *Park v. Chessin* (Sup. Ct. Queens County 1976), 88 Misc. 2d 222, 387 N.Y.S.2d 204, turn upon causation, although so described by Mr. Justice Moran. There, a professional negligence action for malpractice and/or fraud causing pain and suffering to a now deceased infant, it was alleged that the mother had a child in 1969

who died shorly after birth as a result of a polycystic kidney condition. Subsequent thereto she was under the care of defendant doctors, who advised her that a future pregnancy would not result in the birth of a congenitally defective child. Upon such advice, she became pregnant and gave birth to Lara on July 31, 1970. She, too, had a polycystic kidney condition from which she died approximately 2½ years later.

The complaint was held to state a cause of action. The principal basis was that at the time of the conception, the person had the same rights as existed prior to conception. To support the position, *Piper v. Hoard* (1887), 107 N.Y. 73, 13 N.E. 626, was referred to. That was an action to recover a portion of the property occupied by the defendant as a result of a fraud perpetrated prior to the child's conception in inducing her mother to marry. If the misrepresentations had been true, plaintiff would have been the sole owner of the property. She had a right of action, although not in being at the time of the wrong.

So also there is foreseeability, the touchstone of the quality of an act as negligence, the most important test in determining duty. (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 622; *Pullman Palace Car Co. v. Laack* (1892), 143 Ill. 242, 260.) It is well established that the injury need not be foreseeable in the precise form in which it occurs. Nor need an injury to the specific person be foreseeable. The likelihood of harm in some form to a class of person is sufficient. (*Pullman Palace Car Co. v. Laack* (1892), 143 Ill. 242, 260; *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 622; *Wintersteen v. National Cooperage & Woodenware Co.* (1935), 361 Ill. 95, 103.) In *Wintersteen v. National Cooperage & Woodenware Co.* (1935), 361 Ill. 95, 103, this court stated:

"*** It is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally

flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. This duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest or the proximity of relationship between the parties. It extends to remote and unknown persons. *Colbert v. Holland Furnace Co.* 333 Ill. 78; *Baird v. Shipman,* 132 id. 16."

It was foreseeable that this 13-year-old girl would grow up, marry and become pregnant. Upon the happening of this event, the defendant hospital and doctor were chargeable with the knowledge of what she and her child would encounter as a result of the wrongful transfusion of blood. More than that, however, it must be remembered that defendants are a hospital and a doctor and held to the degree of knowledge of experts. *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 417, 420.

Conduct which puts harmful consequences in motion and injury to a foreseeable class of person as a direct result may be negligence for which responsibility may attach. That there may be a time gap between the wrongful act and the suffering is immaterial. The cause of action is uniformily created not at the time of the negligent act, but only when the injury has been sustained. As this court observed in *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 432:

"[W]e have held that an action to recover for personal injuries resulting from a sudden traumatic event accrues when plaintiff first knew of his right to sue, *i.e.* at the time when the injury occurred. (*Leroy v. City of Springfield,* 81 Ill. 114; see *Madison v. Wedron Silica Co.,* 352 Ill. 60, 62.)"

The fact that there is a gap between the wrongful act and

the time of injury will not bar the action. *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1975), 61 Ill. 2d 129, 134; *Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32, 37-41; *Rozny v. Marnul* (1969), 43 Ill. 2d 54.

Here the wrongful act allegedly took place before conception, but injury attached at the moment of conception. It was only then that the cause of action arose. *Leroy v. City of Springfield* (1876), 81 Ill. 114; *Madison v. Wedron Silica Co.* (1933), 352 Ill. 60; *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418.

It has long been the public policy of this State to protect children not in being at the time of a particular wrongful act. Our statutes evince this in multiple ways. The Probate Act provides that children born after a will is made are entitled to receive a portion of the estate unless either provision in the will is made for them or the will evidences the intent of the testator to disinherit them. (Ill. Rev. Stat. 1975, ch. 3, par. 48.) So also a statute empowers courts to appoint guardians *ad litem* to protect the possible interests of persons not in being in real or personal property. (Ill. Rev. Stat. 1975, ch. 22, par. 6.) The Probate Act also authorizes the appointment of guardians *ad litem* to represent the interests of such persons on the sale or mortgaging of property. Ill. Rev. Stat. 1975, ch. 3, par. 232.

Consider also the ancient equitable doctrine of representation whereby the interests of unborn contingent remaindermen can be found by a court if they are adequately represented. *Gunnell v. Palmer* (1938), 370 Ill. 206; *Longworth v. Duff* (1921), 297 Ill. 479; *Hale v. Hale* (1893), 146 Ill. 227.

Here, if we were to deny recovery to the child because she was not in being at the time the wrong was done, we would be reviving old fictions of the law, and disregarding the principle of duty so important in the law of torts.

More than that, we would be abdicating our obligation to keep the common law equal to the problems of life.

I must note that the dissenting opinion of Mr. Justice Ryan is based upon the erroneous premises that our holding means (1) abandoning "the traditional fault concept of liability premised upon duty and foreseeability and [embracing] instead a system which depends wholly upon the element of causation," and (2) that "[t]he adoption of causation as the single determinative factor on the issue of liability results not, as professed, from a logical extension of the earlier decisions of this court, but rather from definite choices of policy on the part of the majority." It then concludes, to paraphrase Mr. Justice Holmes' famous remark (*Schenck v. United States* (1919), 249 U.S. 47, 52, 63 L. Ed. 470, 473, 39 S. Ct. 247, 249) like someone shouting "fire" in a crowed theatre that such "augurs the demise of the dual foundations of the tort concept: duty and foreseeability."

I do not agree that we have eliminated the fault concept. Under the allegations of the complaint the conduct of defendants constitutes negligence and perhaps even wilful and wanton misconduct. Similarly, the causal connection between the fault of defendants and the injuries to the daughter is sufficiently alleged. The adequacy of proof is, of course, not before us at this stage of proceedings.

As I read the opinion of Mr. Justice Moran, it does not substitute causal connection for foreseeability. Here the plaintiff's mother was negligently transfused with incompatible blood. Certainly this was a violation of duty owed the patient by defendants.

Here there is a single question for decision: Whether there was a duty under these circumstances to a plaintiff who was not in being at the time of a wrongful act. The appellate court, as well as this court, have pointed out that the touchstone of duty is foreseeability. This factor, more

than any other single element, determines the existence of duty. The dissents have confused duty and causation. Each is separate from the other. Foreseeability plays no part in causation. As one court observed (*Christianson v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.* (1896), 67 Minn. 94, 97, 69 N.W. 640, 641): "What a man may reasonably anticipate is important, and may be decisive, in determining whether an act is negligent, but is not at all decisive in determining whether that act is the proximate cause of an injury which ensues." Cause is an element which becomes operative only if a duty is breached and damages result. Foreseeability is an element to be considered only in determining negligence, but plays no function in determining whether that negligence is causal. As Harper and James put it (2 F. Harper & F. James, Torts 1135 (1956)), "[f]oreseeability of damage is altogether irrelevant in determining the existence of the cause in fact relationship." To the same effect, see *Strahlendorf v. Walgreen Co.* (1962), 16 Wis. 2d 421, 114 N.W.2d 823; Prosser, Torts sec. 50, at 289 (3d ed. 1964); Green, *Foreseeability in Negligence Law,* 61 Colum. L. Rev. 1401, 1417 (1961); Green, *The Causal Relation Issue in Negligence Law,* 60 Mich. L. Rev. 543, 549 (1962); Restatement (Second) of Torts sec. 435(1) (1965).

Whenever we commingle the elements of duty and causation, error results. That causation and fault are separate elements becomes clear when one considers that to recover in a negligence action plaintiff must prove not only that defendant was guilty of negligence, but that this negligence was a proximate cause of the injury complained of. That negligence and causation are distinct propositions is best demonstrated by Illinois Pattern Jury Instruction, Civil, No. 21.02 (2d ed. 1971).

In view of the facts alleged in the complaint, it is plain error to urge that the case was decided on causation. This matter is here on a motion to dismiss. We must, in this

posture, assume all well pleaded facts to be true. (*Bulk Terminals Co. v. Environmental Protection Agency* (1976), 65 Ill. 2d 31, 37; *Acorn Auto Driving School, Inc. v. Board of Education* (1963), 27 Ill. 2d 93, 96.) The complaint alleges that the negligence of the defendants was a proximate cause of plaintiff's injury. We must, for the purposes of this motion, accept this to be true.

Amongst the differences between duty and causation is that duty is always a question of law. (Prosser, Torts sec. 45, at 289 (4th ed. 1971).) Causation, on the other hand, is preeminently an issue of fact. (*Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 418-19, and *Lerette v. Director General of Railroads* (1922), 306 Ill. 348, 353.) Prosser, to whom the dissent alludes, says this concerning causation:

> "In cases where reasonable men might differ—which will include all but a few of the cases in which the issue is in dipute at all—the question is one for the jury." Prosser, Torts sec. 45, at 289 (4th ed. 1971).

That causation is usually an issue of fact is demonstrated by the fact that summary judgment cannot be entered on this question. (*Dakovitz v. Arrow Road Construction Co.* (1975), 26 Ill. App. 3d 56, 64; *Greer v. Checker Taxi Co.* (1973), 10 Ill. App. 3d 814; *McVey v. Discher* (1970), 122 Ill. App. 2d 408, 414.) On the other hand, summary judgment may reach the issue of duty.

It would be improper to determine the issue before us on the matter of causation, unless we were to act as triers of fact.

In my opinion, Mr. Justice Ryan's dissent misconceives the nature of foreseeability. This is shown by its measuring unforeseeable consequences in terms of the period of time in which the tortfeasor could be subject to claim. If foreseeability were thus to be measured, then the

infant injured at birth should not have a cause of action two years after he reaches his majority, nor should one injured 20 years after the manufacture of a defective product have a right of action. But we know that the statute of limitations does not run against a minor, an incompetent, or one imprisoned on a criminal charge, and that such a person may bring an action within two years after the removal of such disability. (Ill. Rev. Stat. 1975, ch. 83, par. 22.) No cause of action in the case of a defective product arises until injury to the plaintiff. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 428.) In some instances this may be over 20 years after the making of the injury-producing product. *Mickle v. Blackmon* (1969), 252 S.C. 202, 166 S.E.2d 173 (13 years); *Rosenau v. City of New Brunswick* (1968), 51 N.J. 130, 238 A.2d 169 (22 years); and *Durant v. Grange Silo Co.* (1960), 12 App. Div. 2d 694, 207 N.Y.S.2d 691 (12 years).

Nor is the question of a cause of action being transmitted genetically or the genetic consequences from long-term exposure to radiation before us. Here our sole concern is whether there can be a recovery under the circumstances of the instant case. It is the duty of this court to address itself to the issues presented by the particular litigation. See *National Jockey Club v. Illinois Racing Commission* (1936), 364 Ill. 630, 631.

It would appear Mr. Justice Ryan's dissent uses this case as a vehicle to complain of what it terms "our present day system of tort law." We are not concerned with automobile insurance rates, nor the premiums of health insurance benefits, nor the cost of medical malpractice insurance. Such questions involve many issues foreign to the question presented here.

Equally immaterial is the fact that certain malpractice legislation, as well as a no-fault law, have been stricken down by this court. *Wright v. Central Du Page*

*Hospital Association* (1976), 63 Ill. 2d 313; *Grace v. Howlett* (1972), 51 Ill. 2d 478.

For the reasons expressed, I would affirm the judgment of the appellate court.

MR. CHIEF JUSTICE WARD, dissenting:

I agree with Mr. Justice Underwood's observations.

The holding that a person not in being at the time of a defendant's claimed negligence has a cause of action obviously creates conceptual difficulties, as well as concrete problems, such as how to measure the insurance risk and the possible exposure of a defendant to claims by successive generations of plaintiffs who complain of genetic injury. To say that, when difficult cases hereafter arise, the judiciary will draw "rational distinctions, consonant with current perceptions of justice" is to me simply a placebo.

MR. JUSTICE UNDERWOOD, also dissenting:

I agree generally with Mr. Justice Ryan's statements of legal principles and the rationale of his dissenting opinion. It would serve no useful purpose to rephrase those sentiments here, but several observations may be appropriate.

The attempts by the majority to find support for its result are not at all persuasive. The reference to a husband's action for loss of consortium as a result of injuries to his wife is, of course, inapposite for the injury there is to a presently existing relationship. Nor are *Jorgensen v. Meade Johnson Laboratories, Inc.* (10th Cir. 1973), 483 F.2d 237, and *Park v. Chessin* (Sup. Ct. Queens County 1976), 88 Misc. 2d 222, 387 N.Y.S.2d 204, helpful. The former was a strict liability case not relevant to this negligence action, and the latter a trial court decision presently in the appellate process.

As this court emphasized in *Cunis v. Brennan* (1974),

56 Ill. 2d 372, 375, and in *Mieher v. Brown* (1973), 54 Ill. 2d 539, 544, foreseeability is not conclusive as to the existence of a duty, and I have a great deal of difficulty with the concept of a duty owing to a person who is not yet conceived, particularly when recognition of that concept permits a lawsuit to be filed 50 or 60 years after the negligent act from which it arose. Conceding the foreseeability of the injury and its causal connection with the alleged negligence of defendants does not convince me that our existing rule limiting liability to post-conception injuries should now be abandoned. Considering the likelihood of suits filed decades after the alleged negligence occurred, the difficulty of proving or defending against such claims, the impossibility of actuarial measurement of the risks involved, successive recoveries by unborn abnormal generations affected by genetic changes, the absence of persuasive precedent and what I suspect will be unanticipated hazards usually accompanying ventures into uncharted waters, I believe this departure from our rule denying recovery for preconception injuries is both unnecessary and undesirable.

MR. JUSTICE RYAN, also dissenting:

I must dissent from the majority's decision because I agree with Dean Prosser "that liability must stop somewhere short of the freakish and the fantastic." (Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 27 (1953).) I believe that the majority decision, as a practical matter, has abandoned the traditional fault concept of liability premised upon duty and foreseeability and embraced instead a system which depends wholly upon the element of causation. Though the majority decision pays lip service to the concepts of duty and foreseeability, the effect of the decision is to emasculate these principles whenever causation can be shown. The adoption of causation as the single determinative factor on the issue of liability results

not, as professed, from a logical extension of the earlier decisions of this court, but rather from definite choices of policy on the part of the majority. Those choices, however, are made at the expense of competing social policies which underlie the more traditional notions of liability in tort, and, I believe, augur the demise of the dual foundations of the tort concept: duty and foreseeability. To properly consider the instant case, one must examine briefly the origin of the trend to exalt the notion of causation, and the policies which initially generated the movement.

Natural sympathy for unfortunate individuals who suffer damages through no fault of their own has rendered quite acceptable the theory, currently in vogue, that compensation to an innocent victim should be spread over a broad base and passed on to the public either through the insurance premiums the public pays or as a cost of doing business. (See generally Harper and James, Torts (1956).) As one commentator has succinctly stated, the basic slogans of this line of reasoning are: "Let All Accident Victims Be Compensated" and "Let The Loss Be Spread." (Cooperrider, *A Comment on the Law of Torts,* 56 Mich. L. Rev. 1291, 1299 (1958).) As this doctrine of "spread the risk" has evolved, the interest of tort law in fault has declined, because the doctrine's emphasis is upon the existence of a fund to compensate the victim and not upon the liability of the individual defendant. Concomitantly, the traditional legal concepts of duty and foreseeability have increasingly come to be seen as mere catchwords to be manipulated according to the results one wishes to reach. (See Keeton, *Creative Continuity in the Law of Torts,* 75 Harv. L. Rev. 463, 464-65 (1962).) I concede that this philosophy has a certain philanthropic appeal, but only so long as the burden on the public can be comfortably borne. Today's decision brings us perceptibly closer in our inexorble procession to that point at

which the burden becomes unbearable.

The advance of the spread-the-risk doctrine has inevitably resulted in the relaxation of the traditional tort elements of duty and foreseeability, and in an increased emphasis upon the element of causation as the determinative factor in liability. This is so because the policies which underlie the doctrine, and which the majority inescapably approves today, are not compatible with a healthy solicitude for the traditional concept of duty. Generally stated, these policies are that every injured person is entitled to compensation, and that the loss should fall upon the defendant, who is considered better able to distribute the cost. (Cooperrider, *A Comment on the Law of Torts,* 56 Mich. L. Rev. 1291 (1958).) A court cannot approve the concept of risk spreading until it at least tacitly accepts one or both of these principles. In so doing, the court jettisons the fault theory of tort law in favor of a system based merely upon causation. In my opinion, the damning effect of this process is that it totally disregards the competing policy of limiting the burden to which the public can be subjected and focuses solely upon the need of the injured individual.

In my view, the majority's decision can only be viewed as a tacit acceptance of causation as the sole determinant of liability. Though couched in terms of duty and foreseeability, the majority's decision certainly does not comport with any traditional understanding of those terms. The fundamental expression of the need in the law of negligence for a concept of duty, grounded upon foreseeability, was provided long ago by Justice Cardozo in *Palsgraf v. Long Island R.R. Co.* (1928), 248 N.Y. 339, 162 N.E. 99. As paraphrased by Dean Prosser: "Negligence must be a matter of some relation between the parties, some duty, which could be founded only on the foreseeability of some harm to the plaintiff in fact injured. 'Negligence in the air, so to speak, will not do.' " Prosser,

*Palsgraf Revisited,* 52 Mich. L. Rev. 1, 5 (1953).

In determining, then, to whom a duty is owed, foreseeability is one element by which we are guided. We made clear, however, in *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 375, that "the existence of a legal duty is not to be bottomed on the factor of foreseeability alone." Nonetheless, foreseeability is the element which circumscribes the outermost limits of duty. Thus, as we held in *Cunis,* no legal duty arises unless harm is *reasonably* foreseeable. However, there are areas of foreseeable harm where no legal obligation arises. Prosser, Torts sec. 56, at 340-41 (4th ed. 1971).

In addition to foreseeability of harm, the concept of legal duty includes and expresses considerations of social policy. As Dean Prosser accurately commented: "In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.' " Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 15 (1953).

It is thus evident that judicial discretion is an integral part of the duty concept. This does not, however, imply that the concept is illusory, or that the rules of law on the subject, which have been developed over many years, should be blithely ignored. Today's decision abrogates what I had thought was an unquestionable rule of law, that "negligence in the air, so to speak, will not do." (Pollock, Torts 361 (14th ed. 1939).) A holding which finds a duty of care owed to an entity which is not in existence must be considered the classic illustration of "negligence in the air."

Although the majority professes to find a legal duty in this case within the realm of foreseeability, it has, in effect, abandoned the concept of foreseeability and accepted the notion that where causation is shown all

results are foreseeable. Neither causation nor foreseeability standing alone are adequate standards upon which to predicate liability. It must be admitted that in the normal course of events there existed the possibility that the injury complained of in this case would result from the acts of the defendant. But, as we stated in *Cunis* "[t]he creation of a legal duty requires more than a mere possibility of occurrence." (56 Ill. 2d 372, 376.) In a sense, to use a well-worn phrase, "through hindsight, everything is foreseeable."

The unprecedented step this court has taken in this case is, the majority contends, required by "[l]ogic and sound policy." We would do well to remember, however, that "[t]he life of the law has not been logic: it has been experience." (O. W. Holmes, The Common Law 1 (1923).) Since experience is the life of the law, for the reasons stated later in this dissent, I believe experience in the field of tort law demands that our concept of legal duty be circumscribed by something more definable and restraining than simple foreseeability. Otherwise, the philosophies expressed by the majority will strip the concept of duty of all vitality and leave recovery solely to the unfettered whim of causation.

This decision holds the potential for far reaching and, in the broadest sense of the word, *unforeseeable* consequences. Under the majority's theory, it is entirely possible that a doctor or a hospital could be subject to a claim half a century after the negligent act was performed. If the mother in this case had received the transfusion at the age of two or three, if she gave birth at the age of 40, and if the action were not brought until the child reached majority, then nearly 60 years would have elapsed between the negligent act and the institution of the suit. Under this decision, there is no reason, in cases where certain deficiencies are passed from generation to generation, that a cause of action cannot be maintained by any individual

at any point in the chain of heredity.

Nor is the possibility of a cause of action being transmitted genetically out of the question. The genetic consequences which could result from a nuclear accident or from long-term exposure to radiation are, unfortunately, no longer matters of concern only to writers of science fiction. (See Comment, *Radiation and Preconception Injuries: Some Interesting Problems in Tort Law*, 28 Sw. L.J. 414 (1974).) It is also not beyond the realm of possibility that the use of modern drugs could cause inherited deformities. Such a hereditary defect could be passed on to successive generations, making it impossible to determine how long a potential claim could confront an institution. Under these circumstances, it is difficult to perceive how an individual or institution could adequately provide insurance coverage, or how an insurer could establish reserves to cover a potential loss. The instant case presents us with an opportunity to anticipate and forestall such hereditary causes of action by drawing a line which limits liability "short of the freakish and the fantastic" (Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 27 (1953)). Failure to do so could lead unavoidably to liability stretching across generations.

The majority feels confident that future courts will prevent such a result from ever occurring. I am less optimistic. If long-established principles of law may be discarded in this case in order to allow what is considered to be a desirable result, what assurance is there that they will be resurrected in the future? It seems more likely that a future court, armed with today's decision, will take one more "logical" step down the slippery slope to absolute liability. For are not our twin slogans now, "Let All Accident Victims Be Compensated" and "Let The Loss Be Spread"?

Naturally, our sympathies are with the unfortunate child. The responsible individual, however, is not relieved

of all liability if we find that the child has no cause of action. In this case the person who was injured through the wrongful act was the child's mother, who, at the time, was 13 years old. The injury was to the mother in the first instance and not to the child. It is only through the injury brought about in the mother that the child has sustained an injury. It must be remembered that the mother has brought an action against the defendants in this case in her own name as well as the action now under consideration. If the mother is entitled to recover in her own right, much of the damages claimed by the infant in this case will be recovered by her parent.

My deepest concern with the majority decision is that it is symptomatic of the increasing tendency of the courts to expand the traditional limits of tort law with little regard for the resultant social consequences. As was noted earlier in this dissent, the idea has developed that the damages suffered by innocent persons should be spread over a broad base either through insurance or as a cost of doing business. An ever-broadening concept of duty has evolved to accommodate this theory, bringing more persons under the protective umbrella. Once under this umbrella, sympathetic juries and an increasingly efficient plaintiff's bar have managed to inflate the size of verdicts. The combination of these two factors has skyrocketed the cost of spreading the loss over a broad base so that the cost to the individual members of the public is no longer insignificant. We have painfully learned that the "spread the risk" theory of tort law depends upon the "deep pockets" of the general public.

I believe we have finally reached the point where the public can no longer or will no longer bear the economic burden of our present-day system of tort law. Automobile insurance rates have reached absurd heights, premiums for health insurance increase regularly and rapidly, and the overbearing cost of medical malpractice insurance, with its

attendant social ills, has become a matter of common knowledge. In some States the so-called malpractice crisis has resulted in the closing of hospital emergency services, the withdrawal of insurance underwriters from the field, and the abandonment by some physicians of their chosen specialties. *Symposium, The 1975 Indiana Medical Malpractice Act,* 51 Ind. L.J. 91, 92-94 (1975).

The public, asked to endure this intolerable economic strain, is seeking, through its elected representatives, to reduce this burden through various legislative schemes which either limit recovery, modify judicially created rules of law, or adopt a no-fault system of compensation. A number of jurisdictions have taken these steps. (See Stewart, *The Malpractice Problem—Its Cause and Cure: The Physician's Perspective,* 51 Ind. L.J. 134, 135 n.9, for a list of these statutes.) We have seen such attempts in Illinois, though the legislation failed to withstand particular constitutional challenges. (See *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313 (holding the provisions of a comprehensive medical malpractice act unconstitutional); *Grace v. Howlett* (1972), 51 Ill. 2d 478 (holding unconstitutional an act concerning the compensation of automobile accident victims).) No-fault legislation has also been introduced in the Federal Congress in the recent past. (See Stewart, *The Malpractice Problem—Its Cause and Cure: The Physician's Perspective,* 51 Ind. L.J. 134, 135 n.10 (1975) (citing proposed Federal legislation).) The current legal literature abounds with various no-fault proposals (see *Symposium, The 1975 Indiana Medical Malpractice Act,* 51 Ind. L.J. 91, 97 n.28 (1975), and the articles cited thereunder), and it has been advocated that a no-fault-type system replace our present tort system. (O'Connell, *Expanding No-Fault Beyond Auto Insurance: Some Proposals,* 59 Va. L. Rev. 749 (1973).) Regardless of the merits of these various legislative and scholastic proposals, we cannot ignore the fact

that the public is seeking some alternative to the burdens brought about under our present practice of spreading the risk.

It would be inaccurate to lay all the blame for the current woes of our tort system upon the doorsteps of the bar and the courts. However, we must certainly shoulder a large share of the blame. In my opinion, the public has clearly indicated that it is no longer willing to silently accept the economic burdens imposed upon it. Yet, though the message is unequivocal, for some reason it is being consistently ignored. The bar and the courts of this State continue to rush blindly forward, ever expanding and enlarging the area of potential recovery and therefore the burden the public must bear. We must establish, or perhaps more accurately, reestablish, reasonable limits and boundaries based upon the fault concept of tort recovery, or the legislature, urged on by a disgusted and over-burdened public, will be forced to act.

In light of decisions like that which we announce today, it appears that this court is unwilling to take such an approach. I feel that legislative action is therefore inevitable. It is my hope that the fault concept of tort recovery, in which I firmly believe, survives. Without unduly extending this dissent, I believe generally that a person injured through another's fault should recover adequate, not exorbitant, damages. The concept of liability based upon fault is premised on the simple principle that an individual who harms another through conduct which falls below the accepted norm of the community should compensate the injured party. It is my view that this principle represents the popularly accepted under-standing of fairness and justice. When the remote, albeit logical, consequences of this principle are limited and tempered by the pragmatic considerations which have traditionally been expressed through the concepts of duty and foreseeability, a fair and workable system of compen-

sation results. When these limitations. are removed by reliance upon a philosophy which places compensation of the individual above all other considerations, the result is a system which unjustly burdens the innocent public which is required to pick up the bill.

Liability based upon fault, which has been recognized for generations and which is still adequate to compensate the great majority of tort victims, should not be sacrificed through a legislatively created no-fault system of compensation simply because the courts have sought to permit recovery by those who are unfortunately injured in a manner outside the traditional fault concept. For such unfortunate persons, it may be appropriate to legislatively provide nonfault compensation for actual loss. It is not, in my opinion, appropriate to manifest our sympathies for these injured parties by permitting compensation through the extension and distortion of the ideas of duty and foreseeability beyond the bounds of reason.

In light of the views of law, and personal sentiment, which I have expressed, I cannot concur in the majority decision and must respectfully dissent.